STATE of Minnesota, Respondent,

v.

Jeanne NEWSTROM,
petitioner, Appellant.

No. CO–83–1325.

Supreme Court of Minnesota.

July 19, 1985.

**526**

John E. Mack, New London, for appellant.

Hubert H. Humphrey, III, Atty. Gen., Michael K. Jordan, Asst. Atty. Gen., St. Paul, for respondent.

John W. Whitehead, Manassas, Va., Wendell R. Bird, Atlanta, Ga., amici curiae.

Richard W. Summers, Atlanta, Ga., for Rutherford Institute of Ga., Legal Defense Foundation.

WAHL, Justice.

In 1981, Jeanne Newstrom and her husband removed their two children from afternoon classes at public school and began teaching them at home during those hours. Jeanne Newstrom was subsequently charged and convicted, after a jury trial, of violating Minnesota's compulsory school attendance law. Minn.Stat. § 120.12, subd. 3 (1984). A three-judge district court panel affirmed the conviction. We reverse.

Jeanne Newstrom is the mother of two school-age children, Katie and Dawn, both under 9 years of age at the time of the original criminal charge. She and her husband live with their children near Bovey, Minnesota, which is in Coleraine Independent School District No. 316. When the Newstroms removed their children from afternoon classes at public school, they contacted school district superintendent Ronald Maertens and told him of their plans for part-time home schooling. Maertens gave Jeanne Newstrom the textbooks he was required to provide to private schools under Minnesota law and began discussing with her the statutory requirements of a private school. Jeanne Newstrom was the only teacher of the Newstrom Family School.

In August, 1981, Maertens advised Jeanne Newstrom by letter that her school was being denied recognition and that she must send the children full time to the public school. Upon the advice of the Itasca County Attorney, Maertens made further inquiries concerning the Newstrom Family School and Jeanne Newstrom's qualifications as a teacher. On October 8, 1982, Maertens filed a complaint against Jeanne Newstrom, charging her with a misdemeanor for willful noncompliance with section 120.12, subd. 3, the compulsory attendance law, because her home school did not comply with Minn.Stat. § 120.10, subd. 2 (1984) in that she lacked the formal education training required of teachers under that statute. Section 120.10, subd. 2 provides, in part, as follows:

A school, to satisfy the requirements of compulsory attendance, must be one: (1) in which all the common branches are taught in the English language, from textbooks written in the English language, and *taught by teachers whose qualifications are essentially equivalent to the minimum standards for public school teachers of the same grades or subjects* and (2) which is in session each school year for at least 175 days or their equivalent * * *.

(Emphasis supplied.)

At trial, Maertens testified to the minimum educational training requirements for elementary grade public school teachers in Minnesota as then set forth at 5 MCAR §§ 3.041, 3.0501 (1982).[1] The basic requirements were that all candidates for licensure must hold a baccalaureate degree and must have completed a course of study approved by the Minnesota Board of Teaching. 5 MCAR § 3.0501A (1982). It is un-

1. These requirements, now published at Minn. Rules 8700.2700, 8700.2900 (1983), describe the prerequisites for a degree in education that will satisfy the Board of Education's licensure standards for public school teachers.

disputed that Jeanne Newstrom lacked these requirements. She admitted that she did not have a teaching certificate but contended that her background was essentially equivalent to that of a public school teacher. The State did not claim that Jeanne Newstrom was not a good teacher or that her school was not a school in the usual sense of the word. Rather, the State argued that her lack of formal educational training automatically demonstrated that her qualifications were not essentially equivalent to those required of a public school teacher.

Jeanne Newstrom gave testimony regarding the structure of her school and the nature of its curriculum. She also sought to demonstrate that her children had performed successfully on standardized national tests. The trial court would not admit this evidence. Jeanne Newstrom then described her qualifications: she had completed nearly 2 years of schooling at Hamline University, she is familiar with the textbooks used in public schools and has previously taught from them, she is widely read and has had education and/or experiences which she believes are essentially equivalent to those required of public school teachers. She also offered to produce two witnesses—one a teacher, the other a doctor of education—to testify that her qualifications were essentially equivalent to the minimum standards for public school teachers.

The trial court took the position that Jeanne Newstrom's qualifications were to be determined solely on the basis of her educational training and disallowed evidence bearing upon how she taught, test results which indicated how well she taught, her life experiences as relevant to her educational knowledge, her philosophy of education, her reasons for teaching her children at home, and the effectiveness of her children's home schooling. The court also excluded from evidence an exhibit tending to show the Newstroms' good faith attempts to prove to Maertens that the

Newstrom Family School was a bona fide school.

During final argument, Jeanne Newstrom's attorney attempted to argue that experience, knowledge, and performance were relevant to the issue of "essential equivalence." He also sought to argue that Jeanne Newstrom should be acquitted because the teacher requirements in section 120.10, subd. 2, were unclear. In each instance, the trial court sustained objections to this line of argument.

The jury found Jeanne Newstrom guilty and the trial court sentenced her to serve 30 days in jail or to pay a $300 fine and a $30 surcharge. On appeal, the conviction was affirmed by a three-judge district court panel. We granted discretionary review.

■ The crucial and dispositive issue raised by this appeal is whether section 120.10, subdivision 2 is unconstitutionally vague for purposes of imposing criminal liability under section 120.12, subdivision 3 for failure to comply with the state's compulsory school attendance laws. We hold that it is. Minnesota compulsory attendance law requires that children between the ages of 7 and 16 years attend a public school or a private school during the entire time that the school is in session during any school year.[2] Minn.Stat. § 120.10, subd. 1 (1984). Subdivision 2 of section 120.10 sets forth the definitions of a school which satisfies the requirements of compulsory attendance. Such a school "must be one: (1) * * * taught by teachers whose qualifications are essentially equivalent to the minimum standards for public school teachers of the same grades or subjects * * *." Because the term "essentially equivalent" is unconstitutionally vague, Jeanne Newstrom's conviction must be reversed.

■ It is clear at the outset in this case, as it was clear in *Pierce v. Society of Sisters*, 268 U.S. 510, 534, 45 S.Ct. 571, 573, 69 L.Ed. 1070 (1925), that:

2. The statute provides for certain "legitimate exemptions" from compulsory attendance which do not concern us here. *See* Minn.Stat. § 120.10, subd. 3 (1984).

. [N]o question is raised concerning the power of the State reasonably to regulate all schools, to inspect, supervise and examine them, their teachers and pupils; to require that all children of proper age attend some school, * * * that certain studies plainly essential to good citizenship must be taught * * *.

However, a statute which provides, as does section 120.10, the basis of a criminal prosecution, must meet due process standards of definiteness under both the United States Constitution and the Minnesota Constitution. Persons of common intelligence must not be left to guess at the meaning of a statute nor differ as to its application. *Connally v. General Construction Co.*, 269 U.S. 385, 391, 46 S.Ct. 126, 127, 70 L.Ed. 322 (1925). Where a statute imposes criminal penalties, a higher standard of certainty of meaning is required. *Kolender v. Lawson*, 461 U.S. 352, 358 n. 8, 103 S.Ct. 1855, 1859 n. 8, 75 L.Ed.2d 903 (1983). The Supreme Court in *Kolender* explained:

> As generally stated, the void-for-vagueness doctrine requires that a penal statute define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement.

*Kolender*, 461 U.S. at 357, 103 S.Ct. at 1858 (citations omitted).

Both principles underlying the requirement of definiteness—that ordinary people can understand what conduct is prohibited and that the statute does not encourage arbitrary and discriminatory enforcement—are violated by the language of the statute before us. "Essentially equivalent" is at best an ambiguous term. It has no common law meaning nor is it a term of art with an established meaning. If the legislature had intended that the qualifications of a nonpublic school teacher be the same as the minimum standards for a public school teacher, it would have said so. It did not. Instead, the legislature chose a term which implies a judgment without indicating who is to make the judgment or

what criteria are to be used except that the qualifications are to be "essentially equivalent." *See discussion in* Governor's Legislative Committee for Nonpublic Schools, Interim Report 23 (March 1981). No guidance is provided to inform parents whether they are complying with or breaking the law in exercising their own judgment in construing the statute. Indeed, the evidence on the record before us indicates that the Newstroms intended to comply with the compulsory education law, and in good faith believed that Jeanne Newstrom's credentials were "essentially equivalent" to those of a licensed teacher. Moreover, the statute affords no guidance to enforcement officials limiting their discretion in determining whether certain conduct is allowed or prohibited. That the statute lacks even minimal guidelines is evidenced by the fact that the trial courts in Minnesota have arrived at directly conflicting interpretations of the statute. The lower courts in this case and the trial court in *State v. Budke*, 371 N.W.2d 533 (Minn.1985) filed today, concluded that "essentially equivalent" means "the same as" and thus a parent must have at least a baccalaureate degree to be legally entitled to teach his or her child at home. Other Minnesota trial courts have read the requirements in section 120.10, subdivision 2, differently. For example, in *In the Matter of the Welfare of Rishia*, Hennepin County District Court File No. 89134 (decided March 2, 1978), the trial court exonerated parents who were educating their child at home, accepting a "proof of qualifications is in the results" argument. The court explained:

> The Court is more concerned with the ability of the teachers to instruct than with the extent to which they have themselves been formally instructed. All indications are that this child has been well instructed in the compulsory areas required by Minnesota law as well as in numerous other areas which may well serve her through the years.

Conclusion of Law, No. 8. In *State v. Lundsten*, Lake of the Woods County District Court File Nos. 7220 and 7221 (decided

May 20, 1981), the trial court held the statute unconstitutional as applied.

Even the judge presiding at Jeanne Newstrom's trial acknowledged the difficulty he had in interpreting section 120.10, subdivision 2. Although concluding that only Jeanne Newstrom's educational qualifications should be considered, the court did note that there was some question about the meaning of the statute. Since the trial court judges in this state cannot agree upon a reading of section 120.10, subdivision 2, it is reasonable to conclude that laypersons would have even greater difficulty in interpreting it.[3]

■ Courts cannot save a penal statute by imposing post facto limitations on official discretion through case by case adjudications where no such restraints appear on the face of the legislation. Over one hundred years ago, the United States Supreme Court prohibited such a practice, explaining that:

> It would certainly be dangerous if the legislature could set a net large enough to catch all possible offenders, and leave it to the courts to step inside and say who could be rightfully detained, and who would be set at large. This would, to some extent, substitute the judicial for the legislative department of the government.

*United States v. Reese*, 92 U.S. 214, 221, 23 L.Ed. 563 (1876), *quoted in Kolender*, 461 U.S. at 358 n. 7, 103 S.Ct. at 1859 n. 7.

■ Courts may, however, cure a statute of vagueness by placing a limiting construction on its terms, consistent with the intent of the legislature. The state in this case urges as a limiting construction of the term "essentially equivalent" that construction adopted by the three-judge panel below. That court had no difficulty in determining that, by the language of section 120.10, subdivision 2 "[t]he Legislature has imposed minimum standards for public and private school teachers which require a bachelor's degree with an approved study course in education and licensing by the State Board of Teaching." *State v. Newstrom*, Itasca County District Court File No. K–82–627 (decided Aug. 31, 1983). This construction, of course, eliminates any difficulty a citizen or official may have encountered in comprehending the nature of the conduct prohibited by the statute. To adopt this construction, however, would do violence to the specific language and manifest intent of the legislature to permit teacher qualifications, other than those mandated for licensed teachers, to meet the requirements of the compulsory attendance law. By allowing persons with teaching qualifications, not identical to, but "essentially equivalent" to those of licensed teachers, to legally instruct children, the legislature chose a term which, while encouraging the certifiability of nonpublic school teachers,[4] permits, as the Governor's committee noted, "some flexibility in the employment of teachers who may lack professional education credits but whose preparation in

---

**3.** The Governor's Legislative Committee for Nonpublic Schools has also expressed concern about how Minn.Stat. § 120.10 should be interpreted. In its Interim Report of March 1981, the Committee noted that "the topic of defining a school has become one of the most discussed items amongst educators." Governor's Legislative Committee for Nonpublic Schools, Interim Report 33 (March 1981). The Committee explained that interest in changing Minn.Stat. § 120.10, subd. 2 had arisen because "the current statute is vague, * * * [it] avoids the question of quality education, and does not have the support of the court system in treating violators." *Id.* at 33. Although the Governor's Committee ultimately recommended that Minn.Stat. § 120.10, subd. 2, not be changed, the Committee had previously urged that any determination

of "essentially equivalent qualifications" should include "recognition of suitable equivalencies for formal course work." *Id.* at 24, 34.

**4.** In the 1980–81 school year, 94% of the full-time Catholic elementary school teachers in the state of Minnesota held valid and current Minnesota certificates; 4.5% were certifiable. Of Catholic secondary teachers that year, 89% were certified, and 9% were certifiable. All teachers in Missouri Synod Lutheran schools are required to have at least a Bachelor's degree from an approved Lutheran college; most would qualify for a Minnesota certificate. In the Christian Schools International, 93% of the teachers were either certified or certifiable. Interim Report, *supra* n. 3, at 23.

knowledge and background of subject matter may be quite superior." Interim Report, *supra* at 23. We cannot read that flexibility out of the statute by reading in formal educational criteria even though to do so would cure its lack of specificity.

Moreover, it may well be that in that small margin of flexibility lies the constitutional protection afforded the right of parents to direct the education of their children without unreasonable restrictions by the State. *See Farrington v. Tokushige*, 273 U.S. 284, 298, 47 S.Ct. 406, 71 L.Ed. 646 (1927); *see* Minn. Const. art. 1, § 7. Legislation which "unreasonably interferes with the liberty of parents and guardians to direct the upbringing and education of children under their control" has long been recognized as beyond the power of the state. *See Pierce v. Society of Sisters*, 268 U.S. 510, 534–35, 45 S.Ct. 571, 573–74, 69 L.Ed. 1070 (1925).[5] The constitutional validity of a statute which required all teachers to have a baccalaureate degree and a teaching certificate, regardless of the age of the children taught and other qualifications held by the teacher, is a question we need not decide, however, since the statute as written cannot sustain such an interpretation.

An alternative construction, urged in this case by amici curiae,[6] would narrowly construe section 120.10, subdivision 2 to permit enforcement of only those teacher requirements which are justified by a compelling state interest. Amici assume that the parental interest in directing the education of their children is of a constitutional magnitude equal to the parental interest with respect to the religious upbringing of their children successfully asserted by the parent plaintiffs in *Wisconsin v. Yoder*, 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972). In *Yoder*, the court held that the state could not enforce its compulsory school-attendance law against the parents of three Amish teenagers who had completed the eighth grade in the public school system and were then withdrawn by their parents from school. The *Yoder* Court intimated that, in the area of education, the state's primary compelling interests were to "prepare citizens to participate effectively and intelligently in our open political system" and to prepare "individuals to be self-reliant and self-sufficient participants in society." *Yoder*, 406 U.S. at 221, 92 S.Ct. at 1536. Further, the court recognized that:

> [T]he power of the parent, even when linked to a free exercise claim, may be subject to limitations under *Prince* if it appears that parental decisions will jeopardize the health or safety of the child, or have a potential for significant social burdens.

*Yoder*, 406 U.S. at 233–34, 92 S.Ct. at 1542, *referring to Prince v. Massachusetts*, 321 U.S. 158, 64 S.Ct. 438, 88 L.Ed. 645 (1944). The Court concluded, however, that none of the state's compelling interests were advanced by requiring the Amish children's high school attendance for two additional years in place of the "long-established program of vocational education" of the Amish. *Yoder*, 406 U.S. at 222, 92 S.Ct. at 1536. Amici suggest that the "compelling interest" standard be universally applied against all state regulation of education, and that the teacher qualification statute be construed to disqualify from teaching only those persons who cannot show that they are competent to impart the values and skills of political participation and self-reliance to children. We reject this argument on several grounds.

---

**5.** We are concerned that too often the child's interest and ability to participate in planning his or her educational future has been overlooked in litigation involving compulsory school attendance laws. The child's views on educational alternatives should be considered if the child has the maturity to effectively participate in that decisionmaking process. In the present case, the age of the Newstrom children would have severely limited, if not precluded, them from participating in their parents' decision to remove them from their afternoon classes at public school.

**6.** The interest of amici Rutherford Institute and its legal defense foundation is in First Amendment freedom for nonpublic education; they have no relationship to the parties. Amici Curiae Brief at xiii.

First, *Yoder* itself is plainly distinguishable. The Supreme Court in that case repeatedly stressed that the high burden of justification imposed on the state was constitutionally required only because the Amish parents had presented persuasive evidence that continued attendance by their children in the public schools was inimical to and destructive of religious principles deeply embedded in the Amish faith for almost three centuries. The Court made clear that its result would have been to uphold the regulation had the parents not proved convincingly that their free exercise of religion, and, derivatively, their children's, would have been heavily burdened by its enforcement:

> Where nothing more than the general interest of the parent in the nurture and education of * * * children is involved, it is beyond dispute that the state acts "reasonably" and constitutionally in requiring education to age 16 in some public or private school meeting the standards prescribed by the State.

*Yoder*, 406 U.S. at 233, 92 S.Ct. at 1542. The Court also weighed in the constitutional balance the facts that Amish children had attended, and would continue to attend, public schools through the eighth grade, and would continue to receive appropriate education within the Amish community after they left the public school system. Moreover, even in the face of *Yoder's* strong First Amendment claim, the Court held that the state could constitutionally regulate the Amish's own home schools, so long as the regulations were "reasonable." In sum, under *Yoder*, the state must justify by compelling reasons only those regulations which in fact burden the parent's First Amendment rights, and only insofar as regulation burdens those rights. The blanket rule amici would have us adopt, that all parents may assert a constitutionally protected interest of similar magnitude and of even broader scope, is not supported by *Yoder* or any subsequent case decided under the free exercise clause. *See, e.g., Thomas v. Review Bd., Ind. Empl. Sec. Div.,* 450 U.S. 707, 101 S.Ct. 1425, 67 L.Ed.2d 624 (1981); *United States v. Lee,* 455 U.S. 252, 102 S.Ct. 1051, 71 L.Ed.2d 127 (1982); *Bob Jones University v. United States,* 461 U.S. 574, 103 S.Ct. 2017, 76 L.Ed.2d 157 (1983).

Moreover, it would be difficult to find a constitutional justification to effectively prohibit educational regulations, which are not only embraced by the majority of the states, but which seek to achieve those social and cultural functions the United States Supreme Court has recognized as crucial interests to be furthered in state educational programs even though those regulations may not meet the exacting standards of a compelling state interest. The society envisioned or inhabited by Thomas Jefferson when he remarked that a basic education in the "three R's" would sufficiently meet the interests of the State,[7] *Yoder,* 406 U.S. at 225 n. 14, 92 S.Ct. at 1538 n. 14, *citing* Letter from Thomas Jefferson to Peter Carr, Sept. 7, 1814, in Thomas Jefferson and Education in a Republic 93–106 (Arrowood ed. 1930), is no longer the life lived by us, to be lived by our children, or determinative of the role of education in contemporary society.

The states have progressively responded to children's increasing need for more than the "three R's" as our society has become more complex, demanding, and technologically sophisticated and dangerous. State supported and regulated compulsory education was initiated only after the Civil War; by 1918, however, such laws were in force in all the states. *Brown v. Board of Education,* 347 U.S. 483, 489–90 n. 4, 74 S.Ct. 686, 688–89 n. 4, 98 L.Ed. 873 (1954),

---

7. At the time Jefferson wrote, of course, the interest of the State did not include literacy by Black slaves; in some states teaching Blacks to read or even providing them with reading materials was a criminal offense. Genovese, Roll Jordan Roll: The World The Slaves Made 561–63 (1972); *see Brown v. Board of Education,* 347 U.S. 483, 490, 74 S.Ct. 686, 689, 98 L.Ed. 873 (1954). In Massachusetts, in 1789, less than half of the white women were even minimally literate; by contrast almost all of the men were literate. Woloch, Women and the American Experience 68 (1984).

*citing* Cubberley, Public Education in the United States 563–65 (1934 ed.). While initially, under such laws, children were required to attend school only through the elementary grades, many states now require attendance beyond the eighth grade. *See Yoder,* 406 U.S. at 226 n. 14, 92 S.Ct. at 1538 n. 14. These laws were intended not only to afford children basic education, but to protect them from economic exploitation by reinforcing the prohibitions of child labor laws, *id.* at 227, 92 S.Ct. at 1539, even though child labor may well have contributed to a child's education in "self-reliance."

■ The United States Supreme Court has also repeatedly recognized the centrality of public education, beyond its function in developing a child's ability to exercise political responsibility or achieve individual self-reliance, by imposing affirmative obligations on the states with regard to their educational programs. *See, e.g., Brown, supra.* As recently as 1982, the Supreme Court reiterated and affirmed its recognition in *Brown* that:

"Today, education is perhaps the most important function of state and local governments. Compulsory school attendance laws and the great expenditures for education both demonstrate our recognition of the importance of education to our democratic society. It is required in the performance of our most basic public responsibilities, even service in the armed forces. It is the very foundation of good citizenship. Today it is a principal instrument in awakening the child to cultural values, in preparing him for later professional training, and in helping him to adjust normally to his environment. In these days, it is doubtful that any child may reasonably be expected to succeed in life if he is denied the opportunity of an education. Such an opportunity, where the state has undertaken to provide it, is a right which must be made available to all on equal terms."

*Plyler v. Doe,* 457 U.S. 202, 222–23, 102 S.Ct. 2382, 2397–98, 72 L.Ed.2d 786 (1982), *quoting Brown,* 347 U.S. at 493, 74 S.Ct. at 691. In *Brown* itself, the Court relied for its revolutionary holding on the recognition that the circumstances under which a child is educated can and do impart to children social messages of their claims to equality and self-respect which "may affect their hearts and minds in a way unlikely ever to be undone." *Brown,* 347 U.S. at 494, 74 S.Ct. at 691. The Court in fact has explicitly rejected a claim by the State of Texas that it could deny children of illegal aliens admittance to public schools on the ground that these children would never legally vote in the United States, stating that:

[T]he significance of education to our society is not limited to its political and cultural fruits. The public schools are an important socializing institution, imparting those shared values through which social order and stability are maintained.

*Plyler,* 457 U.S. at 222 n. 20, 102 S.Ct. at 2397 n. 20. Plainly the interests of the state in the education of children has not been, and, since *Brown,* can not be, limited to protecting only those purposes deemed compelling in *Yoder.*

We do not mean to suggest that under no circumstances could parents' interest in directing their child's education ever outweigh the state's interest in enforcing its compulsory attendance laws or other regulations, or that "home" schooling is not an option that the legislature could or should make more available to children and their parents under certain conditions. The legislature has determined, at this time, that the legitimate and important goals promoted by education are met when teachers in such home schools as exist under the present statute have qualifications "essentially equivalent" to the qualifications of certified teachers in the same grade or subject. When the state imposes criminal penalties, however, citizens are constitutionally guaranteed that the offense be defined in the statute with sufficient clarity to permit them to understand the nature of the conduct prohibited. The term "essentially equivalent" falls short of that standard. We hold, therefore, that under the

United States Constitution, amendment XIV, and under the Minnesota Constitution, art. 1, § 7, the teacher requirements of Minn.Stat. § 120.10, subd. 2, are unconstitutionally vague insofar as they serve as a basis for a criminal conviction.

If the legislature wants to establish the opportunity in a civil proceeding, perhaps in a hearing on a petition for a temporary restraining order brought by a school district superintendent, for parents charged with noncompliance with compulsory attendance laws to produce evidence and prove on a case by case basis that their qualifications are "essentially equivalent" to those of public school teachers of the same grade or subjects, it is not for this court to forbid it prospectively on constitutional grounds. To do so would be a premature and intrusive exercise of judicial power and an unsettling of the balance which the legislature has attempted to strike between the interests of the child, the parents and the state in the education of children.

Since Jeanne Newstrom's conviction was based solely upon alleged violation of an unconstitutional statute, that conviction must be reversed. Because our ruling on this issue is dispositive, we need not reach the other issues raised in this appeal.

Reversed.