STATE of Minnesota, Petitioner,
Appellant,

v.

Kathleen Rita McKOWN, William
Lisle McKown, Respondents,

Mario Victor Tosto, Defendant.

Nos. CX–90–766, C1–90–767.

Supreme Court of Minnesota.

Sept. 20, 1991.

Hubert H. Humphrey, Atty. Gen., St. Paul, Michael Freeman, Hennepin County Atty. and Michael Richardson, Asst. County Atty., Hennepin County Attorney's Office, Minneapolis, for appellant.

Peter J. Thompson, Thompson & Lundquist, Minneapolis, for Kathleen McKown.

Ronald J. Riach, Peterson, Franke & Riach, Roseville, for William McKown.

Peter M. Lancaster, Timothy E. Branson, Dorsey & Whitney, Minneapolis, amicus for Minnesota Civ. Liberties Union.

Terrence J. Fleming, and Ansis V. Viksnins, Lindquist & Vennum, Minneapolis, amicus for Church of Christ—Scientist.

TOMLJANOVICH, Justice.

On May 9, 1989, 11–year-old Ian Lundman died at his home in Independence, Minnesota.[1] Ian's death was apparently caused by diabetic ketoacidosis, a complication of diabetes mellitus. Ian was occasionally ill in the weeks preceding his death and became seriously ill two or three days before he died.

Kathleen McKown, Ian's mother, and William McKown, Ian's step-father, are Christian Scientists. In accord with their religious beliefs, Ian was treated with Christian Science spiritual healing methods throughout his final illness. He did not receive conventional medical care at any time during that illness.

In late September and early October, 1989, the Hennepin County Attorney presented evidence related to Ian Lundman's illness and death to the Hennepin County Grand Jury. The grand jurors heard testimony from medical doctors indicating that Ian's diabetes was apparently treatable through conventional medicine and that his condition probably could have been stabilized as late as two hours before he died. The jurors also heard testimony regarding the nature and practice of Christian Science healing, and regarding the specific healing methods used in treating Ian Lundman.

Following this testimony, the county attorney instructed the grand jury as to the definition of second degree manslaughter.[2] Having heard this instruction, two of the jurors asked, "Can you explain child neglect at all. Is there any sort of * * * statute that would apply?" The county attorney replied, "Well, I can read you the statute. There's a criminal, it's Minnesota Statute 609.378 * * *." He then read the entire child neglect statute aloud to the jurors, and asked, "Did that answer your question, ma'am?" The juror who posed the question responded, "Mm-hmm."[3] After deliberating, the grand jury returned indictments charging both Kathleen and

---

1. The facts upon which the appealed indictments are based and upon which the district court dismissed those indictments are drawn from testimony delivered before a Hennepin County Grand Jury.

2. The county attorney relied primarily on the established jury instruction for second degree manslaughter, *see* 10 Minn.Dist. Judges Ass'n, *Minnesota Practice,* CRIMJIG 11.24 (3d ed. 1990), including the instructions defining "culpable negligence," and "recklessness."

3. The child neglect provision read to the jurors is found at Minn.Stat. § 609.378 (1988):

(a) A parent, legal guardian, or caretaker who wilfully deprives a child of necessary food, clothing, shelter, health care, or supervision appropriate to the child's age, when the parent, guardian, or caretaker is reasonably able to make the necessary provisions and which deprivation substantially harms the child's physical or emotional health, * * * is guilty of neglect of a child and may be sentenced to imprisonment for not more than one year or to payment of a fine of not more than $3,000, or both.

\* \* \* \* \* \*

If a parent, guardian, or caretaker responsible for the child's care in good faith selects and depends upon spiritual means or prayer for treatment or care of disease or remedial care of the child, this treatment shall constitute "health care" as used in clause (a). *Id.*

William McKown with second degree manslaughter.[4]

The McKowns moved the District Court for the Fourth Judicial District, the Honorable Eugene J. Farrell presiding, to dismiss the indictments against them for lack of probable cause, because the indictments violated due process of law and their rights to freely exercise their religious beliefs, and because the grand jury was improperly instructed with respect to the McKowns' duty of care. The district court dismissed the indictments. It concluded that the child neglect statute and the second degree manslaughter statute were in pari materia, such that the spiritual treatment and prayer exception to the child neglect statute also operated as a defense to the charge of second degree manslaughter. The court determined that the McKown's rights had been prejudiced because the grand jury was not instructed as to the effect of the spiritual healing and prayer exception. It also concluded that the indictments violated due process of law in that the child neglect statute informed individuals that they might rely on spiritual healing and prayer without violating that statute, but did not state that doing so might expose them to other criminal charges if the treatment failed.

On appeal by the state, the court of appeals concluded that while the child neglect and second degree manslaughter statutes were not in pari materia, the trial court was correct to dismiss the indictments as violations of due process. 461 N.W.2d 720. The court reasoned that the child neglect statute did not provide fair notice of potential liability under other criminal statutes, that it permitted arbitrary enforcement, that the McKowns may well have relied on the spiritual treatment and prayer exception to the child neglect statute in determining the course of their son's treatment, and that the state had not clearly enough defined when reliance on spiritual healing became criminal conduct.

The state appealed to this court for reinstatement of the indictments charging respondents with second degree manslaughter. It contends that the court of appeals was correct in concluding that the spiritual healing and prayer exception to the child neglect statute does not apply to the second degree manslaughter statute because the two provisions are not in pari materia. It argues that both the trial court and the court of appeals were incorrect, however, in concluding that the indictments violate due process of law.

I

The trial court concluded that the child neglect statute and the second degree manslaughter statute are in pari materia, requiring that they be interpreted in light of one another. We disagree.

■ "Statutes 'in pari materia' are those relating to the same person or thing or having a common purpose." Apple Valley Red–E–Mix, Inc. v. State, 352 N.W.2d 402, 404 (Minn.1984). Such statutes should be construed in light of one another. See id.; Doe v. State Bd. of Medical Examiners, 435 N.W.2d 45, 49 (Minn.1989). In Doe, this court held that Minn.Stat. § 13.41, Subd. 4 (1986), governing all state licensing agencies, and Minn.Stat. § 147.01, Subd. 4 (1986), which applied specifically to the state Board of Medical Examiners, were indeed in pari materia. The court therefore concluded that a general phrase in section 147.01 could be read to incorporate a similar, but more specific phrase in section 13.41. See id.[5]

---

**4.** Minn.Stat. § 609.205 (1988) reads:

[a] person who causes the death of another by any of the following means is guilty of manslaughter in the second degree and may be sentenced to imprisonment for not more than seven years or to payment of a fine of not more than $14,000, or both:

(1) by the person's culpable negligence whereby the person creates an unreasonable risk, and consciously takes chances of causing death or great bodily harm to another * * *.

Id.

**5.** At issue in Doe was whether "final decision of the Board" as used in section 147.01 should be read in concert with "findings of fact, conclusions of law and specification of the final disciplinary action contained in the record of [a licensing agency disciplinary action]" as used in section 13.41. This court concluded that because the two provisions were founded on the same purpose—regulation of licensing agency

Unlike the statutes at issue in *Doe*, the child neglect and second degree manslaughter statutes are not *in pari materia* and thus, the spiritual treatment and prayer exception to the former cannot be imported into the latter. The child neglect provision applies specifically to individuals with legal responsibility for a child who wilfully neglect that responsibility and thereby cause the child substantial physical or emotional harm. The statute defining second degree manslaughter, however, permits the state to prosecute anyone who causes the death of another by exposing that person to an unreasonable risk of death or great bodily injury. The two statutes are therefore clearly based on separate and distinct purposes. Further, nothing in the language of either provision suggests they are so closely related as to require they be interpreted in light of one another, and neither contains an explicit mandate to construe them together. *See Apple Valley Red–E–Mix*, 352 N.W.2d at 406 (that two statutes have different purposes and that neither mentions the other is evidence that the two are not *in pari materia*).

In *State v. Bolsinger*, 221 Minn. 154, 21 N.W.2d 480 (1946), the appellant contended that a statute allowing the prosecution of an individual who took the life of another by operating a vehicle in a "reckless or grossly negligent manner," Minn.Stat. § 169.11 (1941), was unconstitutionally vague. This court disagreed, relying in part on the definitions assigned to "reckless" and "grossly negligent" in other contemporary homicide statutes. *See Bolsinger*, 221 Minn. at 156, 21 N.W.2d at 486. The court explained that this was appropriate because

> [t]he statute in question and those relating to homicide in force at the time of its enactment relate to one common subject matter, that of homicide. As such, they should be construed as constituting one systematic body [of] law. Each statute should be construed in the light of, with reference to, and in connection with the

others. So construed, the statute in question should be fitted to the statutes in force at the time of its enactment and carried into effect conformably to them. *Id.* at 162, 21 N.W.2d at 486. Thus, the words "reckless" and "grossly negligent" as used in section 169.11 carried the same meaning as they did in other, then-existing homicide statutes.

Respondents here suggest a significantly different application of the doctrine of *in pari materia*. First, they contend that "culpable negligence" as used in the second degree manslaughter statute, adopted in 1963, should be defined in light of "neglect of a child" as used in section 609.378, enacted by the legislature in 1983. The statutory language at issue in *Bolsinger*, however, was construed in light of identical language in existing homicide provisions— the question was whether "reckless" and "grossly negligent" meant the same thing in the one statute as in the others. Second, respondents argue for interpreting the earlier of two statutes in light of the later, while in *Bolsinger* the court adopted precisely the opposite approach. Finally, the court in *Bolsinger* noted several times that the statute at issue and those considered *in pari materia* with it were all homicide statutes, "relate[d] to one common subject matter * * *." *Id.* Here the statutes do not appear to bear the same sort of common purpose. Therefore, application of the doctrine of *in pari materia* in this case is neither necessary nor appropriate.

Respondent also contends that the legislative history underlying the spiritual treatment and prayer exception establishes that it was intended to exempt those who rely on such treatment methods from *all* criminal prosecution related to their reliance on spiritual treatment and prayer in caring for their children. Although legislative history may be useful in interpreting an ambiguous statute, this court generally does not consider it when faced with a clearly worded provision. *See Handle*

---

procedure—"final decision" included findings, conclusions and final disposition. *See Doe*, 435

N.W.2d at 49.

*With Care, Inc. v. Dept. of Human Services,* 406 N.W.2d 518, 522 (Minn.1987); *Molberg v. Marsden,* 294 Minn. 493, 494, 200 N.W.2d 298, 299 (1972) (where language of statute is clear, it defines legislative intent leaving no room for further judicial interpretation). The language of the exception is not ambiguous; it expressly states that relying on spiritual treatment and prayer does not in itself constitute child neglect. *See* Minn.Stat. § 609.378(a) (1988). Thus, we need not consult the exception's legislative history in our interpretation of it.[6]

We therefore conclude that the child neglect statute and the second degree manslaughter statute are not *in pari materia.* The doctrine of *in pari materia* is simply an interpretive tool this court relies on in certain instances to determine the meaning of ambiguous statutory language. Because neither statute is ambiguously worded, we have no need of the doctrine in this instance. Further, because the statutes at issue are not so closely related in either language or purpose as to suggest that they ought be interpreted together, application of the doctrine here would be inappropriate.

## II

Both the trial court and the court of appeals concluded the indictments issued against respondents violate the constitutional guarantee of due process of law. We agree.

■ The essence of respondents' argument is not that either the manslaughter statute or the child neglect statute is so vaguely worded as to make it unreasonably difficult to discern what conduct each prohibits. *See Kolender v. Lawson,* 461 U.S. 352, 357, 103 S.Ct. 1855, 1858, 75 L.Ed.2d 903 (1983) (due process requires criminal statutes to define offenses clearly enough that ordinary people can determine what they prohibit). Rather, respondents contend the child neglect statute misled them in that it unequivocally stated they could, in good faith, select and depend upon spiritual means or prayer without further advising them that, should their chosen treatment method fail, they might face criminal charges beyond those provided in the child neglect statute itself. In short, respondents argue that the child neglect statute does not go far enough to provide reasonable notice of the potentially serious consequences of actually relying on the alternative treatment methods the statue itself clearly permits. Neither the United States Supreme Court nor this court has directly addressed a similar due process claim.[7] In *United States v. Colon–Ortiz,* 866 F.2d 6 (1st Cir.1989), *cert. denied,* 490 U.S. 1051, 109 S.Ct. 1966, 104 L.Ed.2d 434 (1989), however, the United States Court of Appeals for the First Circuit relied on a due process rationale much like that suggested here by respondents.

In *Colon–Ortiz,* the appellant challenged a federal statute prohibiting the distribution of cocaine. That statute, 21 U.S.C. § 841(b)(1)(B), provides that a person convicted of violating it "shall be sentenced to a term of imprisonment * * *, a fine * * *, or both." It goes on to state that "the

---

**6.** Respondent correctly indicates that the legislative history underlying the spiritual treatment and prayer exception contains at least one statement suggesting one representative's intention to protect those who rely on such treatment methods from all prosecution. However, this court has noted that the legislative intent underlying a particular statute is not necessarily reflected in the recorded statements of a particular member and that such statements must "be treated with caution." *Handle With Care,* 406 N.W.2d at 522, 522 n. 8.

**7.** Decisions addressing the issue of "fair notice" in the context of a due process challenge typically involve consideration of whether the language of a particular statute was sufficient to provide an individual charged with violating that statute fair notice of the potential criminality of her or his conduct. *See, e.g., State v. Newstrom,* 371 N.W.2d 525, 528 (Minn.1985) (concluding that statute requiring non-public school teachers hold qualifications "essentially equivalent" to those of public school teachers was unconstitutionally vague). Appellant contends *Walker v. Superior Court,* 47 Cal.3d 112, 253 Cal.Rptr. 1, 763 P.2d 852 (1988), *Hermanson v. Florida,* 570 So.2d 322 (Fla.Dist.Ct.App.1990), and *Hall v. State,* 493 N.E.2d 433 (Ind.1986), support its position that the indictments do not violate due process. None of these decisions, however, substantively address the issue of fair notice as raised by respondents.

court shall not place on probation or suspend the sentence of any person sentenced under this [provision]. No person sentenced under this [provision] shall be eligible for parole during the term of imprisonment imposed * * *." 21 U.S.C. § 841(b)(1)(B). Relying on this latter statement and on several remarks in the underlying legislative history clearly indicating the intention to impose mandatory prison sentences, the trial court concluded it was required to sentence the appellant to prison, despite the language in section 841 indicating that a court could choose to impose only a fine. *Colon–Ortiz*, 866 F.2d at 9–10.

The First Circuit agreed with the appellant's contention that the statute did not provide fair notice conviction would necessarily result in the imposition of a prison sentence. It reasoned that

> [t]he person of ordinary intelligence * * * should not have to guess at the meaning of penalty provisions, or else those provisions are not sufficiently clear to satisfy due process concerns. It is not enough for the congressional intent to be apparent elsewhere if it is not apparent by examining the language of the statute. No amount of explicit reference in the legislative history of the statute can cure this deficiency.

*Id.* at 9. This concern that individuals be given unambiguous notice of the boundaries within which they must operate directly contravenes the state's contention that nothing in the spiritual treatment and prayer exception to the child neglect provision reasonably suggests immunity from all prosecution. The exception is broadly worded, stating that a parent may in good faith "select and depend upon" spiritual treatment and prayer, without indicating a point at which doing so will expose the parent to criminal liability.[8] The language

of the exception therefore does not satisfy the fair notice requirement inherent to the concept of due process.

 Further, the indictments issued against respondents violate the long-established rule that a government may not officially inform an individual that certain conduct is permitted and then prosecute the individual for engaging in that same conduct. *See Cox v. Louisiana*, 379 U.S. 559, 85 S.Ct. 476, 13 L.Ed.2d 487 (1965) (where police official informed protesters they could picket across the street from courthouse, state could not prosecute those protestors for violating a statute prohibiting demonstrations near courthouse); *Raley v. Ohio*, 360 U.S. 423, 79 S.Ct. 1257, 3 L.Ed.2d 1344 (1959) (state could not prosecute individuals for refusing to testify before legislative committee when committee members informed those individuals they could invoke state privilege against self-incrimination).

The spiritual treatment and prayer exception to the child neglect statute expressly provided respondents the right to "depend upon" Christian Science healing methods so long as they did so in good faith. Therefore the state may not now attempt to prosecute them for exercising that right. By virtue of this conclusion, we do not introduce the proposition that conduct complying with one statute *necessarily* complies with all other statutes absent explicit notice to the contrary. Further, we do not here conclude that the state could *never* prosecute an individual whose good faith reliance on spiritual methods of treatment results in the death of a child. Rather, we hold that in this particular instance, where the state has clearly expressed its intention to permit good faith reliance on spiritual treatment and prayer as an alternative to conventional medical treatment, it cannot

---

8. As the court of appeals indicated, at least one other state has attempted to avoid the problem presented in this case by statutorily establishing a point beyond which parents may not rely solely on spiritual means of treatment. Okla. Stat. Tit. 21, § 852 (1988), provides:

> Nothing in this section shall be construed to mean a child is endangered for the sole reason the parent or guardian, in good faith,

selects and depends upon spiritual means alone through prayer, in accordance with the tenets and practice of a recognized church or religious denomination, for the treatment or cure of disease or remedial care of such child; provided, that medical care shall be provided where permanent physical damage could result to such child * * *.

prosecute respondents for doing so without violating their rights to due process.[9]

We therefore conclude that the indictments issued against respondents, charging them with second degree manslaughter in the death of Ian Lundman, violate the constitutional guarantee of due process of law and must be dismissed.

Court of appeals affirmed and indictments dismissed.

COYNE and SIMONETT, JJ., dissent.

GARDEBRING, J., took no part in the consideration or decision of this case.

COYNE, Justice (dissenting).

I respectfully dissent. I fully concur in the majority's determination that nothing in the language of either Minn.Stat. § 609.-378 (1988), the child neglect statute, or Minn.Stat. § 609.205 (1988), setting out the crime of second degree manslaughter, suggests they are so closely related as to require them to be interpreted in the light of each other. Having determined that the two statutes, which have quite different purposes, should not be construed together, the majority goes on to hold that the indictments issued here failed to meet constitutional requirements of due process of law because the child neglect statute did not notify them that although depending on "spiritual means or prayer for treatment or care of disease or remedial care of the child" constituted "health care" for purposes of the child neglect statute, that conduct might, under some circumstances, constitute unlawful conduct pursuant to some other statute. This novel proposition, that conduct which complies with the requirements of one statute complies with all other statutes absent notification to the contrary, is in my opinion nothing more than

the rejected *in pari materia* argument garbed in the cloak of due process. Inasmuch as defendants do not complain that either the child neglect statute or the manslaughter statute is so vaguely worded that one cannot reasonably discern what conduct each prohibits, the due process argument necessarily depends on construing the two statutes together.

Moreover, the due process argument is defective not only because it depends on construing the two statutes together but also because it depends on misconstruction of a statute and because it rests on an unavailable defense to the charge of manslaughter.

As set forth in Minn.Stat. § 609.205(1) (1988), the offense of second degree culpably negligent manslaughter is "an offense that involves both the objective element of negligence and the subjective element of recklessness, * * * *" *State v. Grover*, 437 N.W.2d 60, 63 (Minn.1989). In order to establish the objective element of negligence the state must prove "a gross deviation from the standard of care that a reasonable person would observe in the actor's situation." *State v. Zupetz*, 322 N.W.2d 730, 733 (Minn.1982) [quoting 2 C. Torcia, *Wharton's Criminal Law* § 168 at 272 (14 ed. 1979] ). In order to establish the subjective element of recklessness the state must establish "an actual conscious disregard of the risk created by the conduct." *State v. Frost*, 342 N.W.2d 317, 320 (Minn. 1983).

Statutes of this type have regularly and uniformly withstood due process challenges. Indeed, in *State v. Grover*, 437 N.W.2d at 63–64, we upheld against a due process challenge a criminal statute containing only an objective element of negligence.[1] In doing this, we quoted Justice

---

**9.** The Church of Christ, Scientist, as amicus curiae, argues that prosecuting respondents for relying on Christian Science healing methods in the treatment of their son constitutes a violation of the right to freely exercise religious beliefs guaranteed by both the federal and state constitutions. Because of our disposition of this appeal, however, we need not address this issue.

Also participating as amicus curiae, the Minnesota Civil Liberties Union contends that

the spiritual treatment and prayer exception violates the first amendment's prohibition against state-established religion. Although we find the MCLU's arguments persuasive, our disposition based on due process grounds makes it unnecessary for us to consider the establishment clause issue at this time.

**1.** Specifically, we upheld the child abuse reporting statute, Minn.Stat. § 626.556, subd. 6 (1986), subjecting certain professionals to misdemeanor

Oliver Wendell Holmes, Jr.'s response to a due process challenge to a criminal statute containing a negligence element: "[T]he law is full of instances where a man's fate depends on his estimating rightly, that is, as the jury subsequently estimates it, some matter of degree." *Id.* at 64 [quoting *Nash v. United States*, 229 U.S. 373, 377, 33 S.Ct. 780, 781, 57 L.Ed. 1232 (1913)].

One cannot be convicted of culpably negligent manslaughter simply because one has not "estimated rightly." It is not enough that one has estimated wrongly, even in a grossly deviant sense. The state must also establish that the defendant was aware of the risk created by his or her conduct and actually and consciously disregarded that risk.

The statute on which defendants rely in support of their argument that their prosecution for culpably negligent manslaughter is barred is not the statute dealing with culpably negligent manslaughter, nor is it one of the statutes setting forth the defenses recognized by the legislature as being generally applicable in criminal prosecutions [*See, e.g.,* Minn.Stat. § 609.08 (1988) (duress)]. Rather, defendants rely on what they characterize as an exception to the statute which makes it a gross misdemeanor to willfully deprive a child of various enumerated necessities, including "health care," if the deprivation "substantially harms the child's physical or emotional health." Minn.Stat. § 609.378 (1988). The relevant statutory language is this definition:

> If a parent, guardian or caretaker responsible for the child's care in good faith selects and depends upon spiritual means or prayer for treatment or care of disease or remedial care of the child, this treatment shall constitute "health care" as used in clause (a).

There is no reason to believe that the legislature intended this provision of the child neglect statute to have any effect on a parent's criminal liability for culpably negligent manslaughter. This definitional language does not "except" spiritual means and prayer from operation of the child neglect statute; it simply provides that a parent who "in good faith" selects and depends on spiritual means or prayer for treatment of his or her child is no more—nor less—subject to prosecution for gross misdemeanor child neglect than a parent who furnishes more conventional health care. Whatever kind of health care is selected, one who violates Minn.Stat. § 609.-205(1) (1988) has by definition not acted "in good faith" but has both (a) grossly deviated from the standard of care that a reasonable person would observe in the actor's situation and (b) although aware of the risk created by that deviation, callously or consciously disregarded the risk. Whatever kind of health care is selected, due process does not require notification that selection of and reliance on a course of conduct which appears to comply with the requirements of one statute may not meet the requirements of another.

If, for example, a parent selects conventional health care and engages a physician to treat a child, there is no basis for a prosecution for child neglect because the parent has provided necessary health care. If, however, the parent who selects conventional health care knowingly engages a physician whose license has been suspended or revoked because of habitual neglect of patients caused by drug addiction and if the child should die because of the physician's neglect, I think it highly unlikely that anyone would contend that the absence of a warning in the child neglect statute insulated the parent from a charge of manslaughter. Due process does not require notification that selection of a form of treatment acceptable under the child neglect statute does not eliminate all possible criminal responsibility.

Similarly, a parent who provides clothing for a child has not violated the child neglect statute because the parent has not willfully deprived his or her child of necessary clothing. If, however, the parent knowingly

liability if they know or have reason to believe a child is being abused and yet fail to report the

suspected abuse.

clothes the child in pajamas of flammable material with full knowledge that the child's siblings frequently cause fires by playing with matches, and the pajama-clad child is subsequently burned to death in a fire started by the child's brother, the absence of a warning in the child neglect statute could hardly be said to protect the parent from a charge of manslaughter.

I believe that an individual "should be able reasonably to rely upon a statute or other enactment under which his conduct would not be criminal." 1 W. LaFave & A. Scott, *Substantive Criminal Law* § 5.1(2) at 591 (1986). However, I reject the argument that that concept has any application here. In enacting Minn.Stat. § 609.378 (1988), the legislature did not in any way shield parents from prosecution for culpably negligent manslaughter under Minn. Stat. § 609.205(1) (1988). Any mistake by defendants based on the child neglect statute is a mistake of law, which is not recognized as a defense. 1 W. LaFave & A. Scott § 5.1(d).

This is not to say, however, that defendants' belief that prayer is a better cure than medicine is without relevance in a prosecution under Minn.Stat. § 609.205(1) (1988). As stated in 2 W. LaFave & A. Scott § 7.12(a) at 281–82 n. 28:

> [I]t is no interference with one's freedom of religion to convict of manslaughter one who, for religious reasons, fails to call a doctor when to fail to do so constitutes criminal negligence. Yet an honest religious belief that prayer is a better cure than medicine, that Providence can heal better than doctors, might serve to negative the awareness of risk which is required for manslaughter in those states which use a subjective test of criminal negligence.

As I stated earlier, there is both an objective element and a subjective element to the offense of second degree culpably negligent manslaughter. Here a grand jury returned an indictment charging the defendants with second degree manslaughter, that is, the grand jury found probable cause to believe that the defendants' conduct met both the objective element (unrea-

sonable risk) and subjective element (consciously disregarded a known risk) of the crime of second degree manslaughter. Nevertheless, the majority simply assumes the defendants acted in good faith. Without intending to address the wisdom of prosecuting these parents or to speak specifically to the various evidentiary issues that might arise at a trial of defendants, I assume as a general matter that a trial court would liberally admit evidence supporting defendants' claim that they acted in good faith in relying on prayer and spiritual means rather than seeking medical care. But in light of the action of the grand jury, whether or not the defendants were culpably negligent—that is, whether they created an unreasonable risk and if so, whether they lacked good faith and consciously disregarded a known risk—is in my opinion a jury question, not a question appropriately decided by this court at the pretrial stage on the basis of a mistaken interpretation of a statute.

SIMONETT, Justice (dissenting).

I join Justice Coyne's dissent.