THE STATE OF OHIO *v.*
MISKIMENS ET AL.

(No. 83-CR-120 — Decided
June 15, 1984.)

Court of Common Pleas
of Coshocton County.

*William M. Owens,* prosecuting attorney, for plaintiff.

*Larry* and *Roberta Miskimens, pro
se,* and *Gerald Simmons,* for defendants.

*Warren W. Gibson,* for *amicus curiae* First Church of Christ, Scientist, Boston, Massachusetts.

EVANS, J. Both plaintiff, the state of Ohio, and defendants, Larry and Roberta Miskimens, have attacked all or part of R.C. 2919.22(A)[1] on constitutional grounds, the defendants arguing that the statute is too vague or too broad and the plaintiff arguing that it violates either: (1) the Religious Establishment Clause or Free Exercise Clause of the First Amendment, or (2) the Equal Protection Clause of the Fourteenth Amendment, or (3) the Due Process Clauses of the Fifth and Fourteenth Amendments. The court has also been favored with an extensive brief *amicus curiae,* filed by the First Church of Christ, Scientist, Boston, Massachusetts, which seeks to defend the existing statute against all constitutional attack. In ruling upon these motions this court acknowledges that any statute so challenged is to be presumed constitu-

---

[1] R.C. 2919.22(A) reads as follows:

"No person, being the parent, guardian, custodian, person having custody or control, or person in loco parentis of a child under eighteen or a mentally or physically handicapped child under twenty-one years of age, shall create a substantial risk to the health or safety of such child, by violating a duty of care, protection, or support. It is not a violation of a duty of care, protection, or support under this division when the parent, guardian, custodian, or person having custody or control of a child treats the physical or mental illness or defect of such child by spiritual means through prayer alone, in accordance with the tenets of a recognized religious body."

tional and is to be given, among alternative constructions, that under which the statute can be preserved.

## I

The First Amendment to the Constitution of the United States provides, in part:

"Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; * * * ."

This restriction upon the Congress is, of course, also made applicable to the legislatures of the various states by the Fourteenth Amendment. Similarly, Section 7, Article I of the Constitution of Ohio prohibits "preference" of one religion over another.

As applied to R.C. 2919.22(A), the question then becomes whether by enacting the so-called prayer exemption as part of R.C. 2919.22(A) (be it affirmative defense or not[2]) Ohio's General Assembly has impermissibly made "a law respecting an establishment of a religion" or given "preference" to one religion over another. For the reasons set forth below, I feel it has.

The first sentence of R.C. 2919.22(A) defines the elements of a criminal offense — endangering children. This court finds nothing defective in that definition. See *State* v. *Sammons* (1979), 58 Ohio St. 2d 460 [12 O.O.3d 384]. The statute then continues, however, to create a purported exemption from the consequences of what would otherwise be criminal behavior. In simplest terms, Ohio's present child endangering statute says to parents: "You may not violate your parental duties and thereby endanger your child's health or safety unless you and some of your co-worshippers believe you can." This exemption is based solely upon a religious preference of the accused. How can such a clearly preferential favoring of one group of potential offenders over another group based upon that group's self-proclaimed religious tenets fail to constitute a "law respecting the establishment of that religion?" I think it cannot.

In so finding it is not the intention of this court to interfere with the right of any citizen to hold whatever religious beliefs he may choose. It is not the holding of the religious *belief* that illness should be treated by prayer alone to exclusion of reasonable medical care that creates for such parent the threat of criminal prosecution. Much of the strength of this nation has been our American heritage of tolerance of divergent religious beliefs and of strong intolerance of persecution for those beliefs, and this court supports staunchly both precepts. It is instead the *exercise* of that belief which may be controlled. This distinction between regulation of belief and regulation of practice has long been acknowledged in the law and is not unique to this case or to this court.

Furthermore, in the instant case it is not the *personal* religious practices of these parents which are sought to be regulated. An important line must be drawn between the right of an individual to practice his religion by refusing medical treatment for his *own* illness and that of a parent to practice his religion by re-

---

[2] This court has by Memorandum of Decision filed June 11, 1984, previously discussed the elements of the offense defined by R.C. 2919.22(A) and has previously determined the second sentence of that subsection to be an affirmative defense. A copy of that decision is attached hereto and incorporated by reference.

This characterization also vests the prosecuting attorney with standing to challenge the constitutionality of a statute written by another branch of the party plaintiff, *i.e.*, the state of Ohio. If the prosecutor cannot challenge an affirmative defense, who else ever would?

fusing to obtain or permit medical treatment for *another* person, *i.e.,* his child. This court, as with any governmental entity, can neither know nor care whether someone who relies solely on faith healing *for his own affliction* is religiously or scripturally "correct." But the right to hold one's own religious beliefs, and to act in conformity with those beliefs, does not and cannot include the right to endanger the life or health of others, including his or her children. As well stated by the United States Supreme Court in *Prince* v. *Commonwealth of Massachusetts* (1944), 321 U.S. 158, 170:

"Parents may be free to become martyrs themselves. But it does not follow they are free, in identical circumstances, to make martyrs of their children before they have reached the age of full and legal discretion when they can make that choice for themselves."

This court realizes that *Prince* was a case limited by its own terms to its own facts and that it involved a child labor restriction, not a manslaughter charge. However, its reasoning is sound, its eloquence clear, and its diction prophetic.

The United States Supreme Court has discussed time and again the real meaning of the Establishment Clause and has provided various criteria for other courts to employ in ruling upon these issues. One of these is noted in *Walz* v. *Tax Commission* (1970), 397 U.S. 664, 674:

"We must also be sure that the end result — the effect — is not an excessive government entanglement with religion."

While the Supreme Court cautions that this test is "inescapably one of degree" (*id.*), it has been apparent throughout this trial that the second sentence of R.C. 2919.22(A) hopelessly involves the state in the determination of questions which should not be the subject of governmental inquisition and potential public ridicule — questions such as what is a "recognized religious body," by whom must it be "recognized," for how long must it have been "recognized," what are its tenets, did the accused act in accordance with those tenets, what are "spiritual means," and what is the effect of combining some prayer with some treatment or medicine. The determination of such issues runs clearly afoul of at least one recognized test for determining an impermissible establishment problem, *i.e.,* the "excessive entanglement" test noted in *Walz, supra,* and echoed in *Lemon* v. *Kurtzman* (1971), 403 U.S. 602, at 613. It is also submitted that that entanglement can hardly be said to have any legitimate purpose other than to advance one religion over others.

Counsel for *amicus curiae,* First Church of Christ, Scientist, has cited to the court in his extensive brief numerous examples of areas in which states have made what the *amicus* characterizes as "reasonable attempts to accommodate the need of minority religions," which have been constitutionally sustained by the courts. These include selective service laws, tax laws, school laws, Sunday closing laws, medical practice laws, etc. It is significant to note, however, among the sixty-odd citations of authority from various states in the nation which were tendered by the *amicus* in its extensive brief, not one appears to be direct precedent that this provision can be constitutionally sustained. The *amicus* and the defendants can only argue deductively from authority dealing with other areas of the law — a reasoning which this court finds to be incomplete, faulty, and unconvincing.

To construct a bizarre example of the possibilities engendered by the religious exemption, one could assume that as a part of the "tenets" of some fictitious "recognized religious body," the sacrament of baptism was to be accomplished not merely by placing holy

water on the head of a baby or even by total immersion, but rather by throwing the infant into a deep and swift-flowing river and then permitting assistance to the helpless child only by "spiritual means through prayer alone." How many babies would have to die in this manner before the state would be justified in seeking to regulate this "religious practice?" The answer should be obvious.

In the instant case, the facts are not so dramatic as this admittedly hyperbolic example. However, if normal exposure to common bacteria is substituted for the act of throwing in the baby, then it is easy to see that it is just as wrong to permit an innocent and helpless child to be overwhelmed, not by turbid waters, but by a chest full of what doctors call "purulent exudate" and everyone else calls plain old "pus."

## II

Although the court is satisfied that the issue of the constitutionality of the provisions in question is adequately settled by application of the standards imposed by the First Amendment to the United States Constitution, the state has made further arguments under the Fourteenth Amendment which merit brief comment.

The Fourteenth Amendment guarantees to all citizens "equal protection of the laws." As noted above, R.C. 2919.22(A) creates one standard of behavior for parents of one religious belief and another standard for a different group of parents. It is then inherent that equal protection is thus being denied to the parents not favored by the special exemption. Second, and more important, if the real purpose of R.C. 2919.22(A) is to protect children from parental defalcation, then the prayer exception creates a group of children who will never be so protected, through no fault or choice of their own.

Our law is replete with "status of-fenses," that is, things which children are not permitted to do simply *because they are children* and is similarly replete with special crimes so categorized *because they involve children.* This is a logical and natural extension of the concept of the legal incapacity of a minor. Why then should children not be afforded special protection by our laws, each child on an equal basis with every other child, where the denial of that protection may injure or cripple the child for life or even result in that child's premature death? This special protection should be guaranteed to all such children until they have their own opportunity to make life's important religious decisions for themselves upon attainment of the age of reason. After all, given the opportunity when grown up, a child may someday choose to reject the most sincerely held of his parents' religious beliefs, just as the parents on trial here have apparently grown to reject some beliefs of their parents. Equal protection should not be denied to innocent babies, whether under the label of "religious freedom" or otherwise.

Another and even more controversial type of special protection has been extended by the Supreme Court of the United States to an even more helpless class of person, the unborn but viable fetus. In landmark cases such as *Doe* v. *Bolton* (1973), 410 U.S. 179, and *Roe* v. *Wade* (1973), 410 U.S. 113, the United States Supreme Court has declared that at some point in the development of that unborn child, the various states may prohibit even the mother who carries the child from electing to terminate her pregnancy, thereby denying that "person" of his right to live. There is, of course, great turmoil, both popular and legal, over exactly when that point should be. But for our purposes that question is not important. What is important is that if the highest court in this nation can sanction government intervention in the parent-child relation-

ship to protect a child whose chronological age is still a negative number, then surely it must also sanction such intervention to protect a child who but for the danger posed by the imposition by his parents of *their* religious beliefs upon *his* life, would be quite capable of a life independent from those particular parents. Surely the rights of a thirteen-month-old are no less than those of the yet unborn.

The state, in constructing a statute which attempts to regulate the conduct of a parent in the performance of his or her inherent parental duties and rights, is performing a legitimate governmental function. It is this conduct in general which is sought to be regulated by R.C. 2919.22(A) and it is the conduct of these defendants in particular which is sought to be regulated by this prosecution which is also a legitimate function of government. But the Constitutions of both the United States and the state of Ohio require this court to keep close watch upon the means used to achieve these ends. This holding is nothing more than one act in the discharge of that duty.

For the reasons stated above, this court must hold that the second sentence of R.C. 2919.22(A) is clearly violative of the Constitution of the United States and must therefore be declared to be of no force or effect within this jurisdiction. However, because such holding would operate to the severe detriment of these defendants who are defending against a charge based on past acts committed before this holding, the court must limit its holding to one of prospective application only, commencing with the date of this judgment.

## III

Of defendants' two motions challenging the constitutionality of the statute under which they are charged (R.C. 2919.22[A] — endangering chil-

dren) first filed May 7 and 8, 1984, and resubmitted both at the close of the state's case and at the conclusion of all of the evidence, only defendants' May 7 motion raising the issues of vagueness and overbreadth merits further examination.

The three-pronged test for unconstitutional vagueness is summarized well by the Supreme Court of Ohio in *State* v. *Sammons* (1979), 58 Ohio St. 2d 460, 462 [12 O.O.3d 384]:

"The constitutional infirmities of vague penal statutes are three-fold. Indefinite statutes fail to provide fair notice that the contemplated conduct is forbidden. *United States* v. *Harriss* (1954), 347 U.S. 612, 617. Such statutes also fail to set reasonably clear guidelines for those charged with their administration, resulting in arbitrary and unequal enforcement. *Smith* v. *Goguen* (1974), 415 U.S. 566, 572-73. Additionally, vague criminal statutes often proscribe conduct that, by modern standards, is normally innocent. *Papachristou* v. *Jacksonville* (1972), 405 U.S. 156, 163."

Although *Sammons* well states the test for unconstitutional vagueness, its facts disclose a child punishment case and it confines its holding to the first sentence of R.C. 2919.22(A) and does not address the problems created by the "religious exemption" contained in the second sentence. Therefore its applicability to this case is severely limited.

In particular, the facts of this case have demonstrated the defectiveness of R.C. 2919.22(A) as a fair provider of notice that contemplated conduct is forbidden. In so noting, this court recognizes that the notice referred to is of a constructive nature. I am aware that it is highly unlikely that these defendants, any more than any other citizens, ever, prior to their son's death, sat down and studied, in detail, the provisions of R.C. Title 29 with the specific goal of determining whether their anticipated con-

duct could be legally proscribed. Whether these defendants actually did or did not is of no consequence since they, as with any citizen, were given constructive notice of the contents of all criminal statutes upon their passage into law and codification. The applicable standard is not what *did* they know, but rather what *could* they have known had they chosen to look it up.

In that regard then what could these defendants, or any parents of similar religious inclination, have learned from reading both sentences of R.C. 2919.22(A), endangering children? They would have learned they could not violate a duty of care, protection, or support, if in so doing they might create a substantial risk to the health or safety of their child. So far, so good. But then they would be told that even if they did do something to create a substantial risk to the health or safety of their child such as neglect to provide him with reasonable medical care, that would *not* be a violation of their parental duty *if* they did it under certain conditions, the conditions being that they must "treat the physical or mental illness or defect of such child by spiritual means through prayer alone, in accordance with the tenets of a recognized religious body." And what, they might ask, does that all mean? What is a "religious body?" What is a "recognized religious body?" By whom must it be recognized? Must its "tenets" be somewhere written down? If not, then how will its tenets be proven in court? Who will decide what its tenets are? What is meant by "spiritual" means? Does "by spiritual means through prayer alone" mean that if we use some prayer and then also employ some form of non-spiritual treatment such as medicine or some traditional home remedy that we forfeit our right to claim exemption under this provision?

*Amicus curiae,* First Church of Christ, Scientist, suggests in its brief that what this provision is "clearly designed to prevent" is the administration of any drug or physical remedies or treatments which might endanger the child's health without qualified medical assistance. *Amicus* also submits in its brief that this measure is "not difficult to measure or comprehend" — a statement which could only be made by someone who was not present in this courtroom for the last two weeks.

In short, the now-you-see-it, now-you-don't approach taken by the two sentences of R.C. 2919.22(A) taken in conjunction with the undefined, imprecise, and in many respects unascertainable, standards set by the second sentence in R.C. 2919.22(A) render that entire division so impermissibly vague even after resort to dictionary definitions that it cannot stand against the challenge raised in the defendants' motion to dismiss.

In so holding, I am fully aware that this court on previous occasions denied this same motion. The reason for such holding was not that the motion was totally without merit, but rather that the practical effects of the statute's defects had not yet been shown. After seven days of trial and valiant effort on the part of both prosecution and defense to establish what this law means when applied to the largely undisputed facts of this case, I am now ready to accept the defendants' contention that this division (R.C. 2919.22[A]) is expressed in terms " 'so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application.' " *Columbus* v. *Becher* (1961), 115 Ohio App. 239, 241 [20 O.O.2d 315].

It is now apparent that the statute fails to provide fair notice as to what contemplated conduct is forbidden, and fails to set reasonably clear guidelines for those charged with its administration.

In fact, as pointed out by defendants' standby counsel in his closing

argument, the purported limiting of the exemption to only those who employ "prayer alone" could operate to endanger the very children sought to be protected where an apprehensive parent first resorts unsuccessfully to faith healing, and then refrains from seeking medical assistance for his child out of fear of losing his exemption.

R.C. 2919.22(A) invites precisely the type of confusion and dispute which has permeated this case, specifically a confusion as to what is or is not required by parents who prefer the use of faith healing to treat an illness of their child. The present law would appear to create at least two classes of faith healing: first, good or bona-fide faith healing which must be by prayer alone in accordance with the tenets of some religious body which has somehow become "recognized," and second, bad-faith or sham faith healing which is something other than noted above, and which will not operate to insulate potentially offending parents from criminal responsibility for failing to perform their parental duties. The distinction, perhaps intentional, appears to be unascertainable in a court of law.

## IV

Finally, while this dichotomy may be intellectually troublesome and legally defective, these are not the most serious consequences of this legislative venture into a morass of imprecision and shifting standards. The real tragedy of the present lack of firm definitive standards in this troublesome area of law is demonstrated by the facts of this case, and I cannot permit the proceedings to end without expressing some brief personal observations borne out of my simultaneous feelings of sympathy, grief, and yet revulsion at what these parents have done and what has been done to them.

Whatever the parents' subjective perception of baby Seth's observed symptoms might have been and however intensely they may wish to minimize their own responsibility and to euphemistically characterize the event, the medical evidence presented in the course of this trial establishes that their second child did not just slip away peacefully to be with the Lord.

At the request of the mother, this court permitted her to absent herself from the trial during the autopsy phase of the trial. Perhaps that was a serious mistake on my part because the sad, brutal fact is that Seth Miskimens died. From what started as a common childhood illness, from what started as a simple, easily recognizable, well-known bacterial infection which responds to the most basic of modern antibiotics, and at his home located within a few blocks of a modern, well-equipped emergency hospital, which could have, in all likelihood, saved his life, Seth Miskimens died. First came illness, then more serious illness, then suffering, and then as valiant a struggle as his tiny heart and his weakened lungs would permit. And then after enduring for as long as he could the tremendous pain inherent in the multiple diseases that were attacking him, and then with a raging infection in his tiny chest, he weakened, he faltered, and he died. There is no more gentle way to describe it.

Although it is inaccurate and unfair to say that these defendants killed their son, or even that they are bad or evil persons, the evidence has established that the death of Seth Miskimens *was* a preventable occurrence, and that, although nothing in human events is absolute, the actions of these defendants in failing to provide for Seth the simplest of medical care, in effect, reduced Seth's chances of survival from nearly one hundred percent to less than one percent.

For their role in permitting this matter to escalate to such tragic proportions, each of these parents must answer to his or her own conscience and

ultimately, I suppose, to a significantly higher authority in their lives than this court. It is, however, the legal judgment of this court that under current Ohio law which this court must obey regardless of any personal feelings which I might have, that I cannot sustain any further attempt to impose criminal sanctions upon these defendants for their past acts. The defendants' motion to dismiss the present charge against them must then, for the reasons stated above, be granted and it will be so ordered. However, these defendants and all others of similar "belief," all others perhaps inclined to sacrifice their helpless children upon an altar of self-proclaimed holiness and then to write off the terrible consequences of their inhumanity as a mere "lack of faith," should realize that as of June 15, 1984, a new standard of parental duty will prevail in this jurisdiction and they should exercise their beliefs with prudent awareness of that fact and its potential secular consequences.

*Motion to dismiss granted.*

Memorandum of Decision —
Affirmative Defense

(No. 83-CR-120 — Decided
June 11, 1984.)

EVANS, J.   The first sentence of R.C. 2919.22(A) is a general prohibition against creating a substantial risk to the health or safety of a child, by violating a duty of care, protection, or support. The elements of the offense contained in the sentence as it relates to these defendants can be summarized as follows:

(1) Were the defendants the parents of Seth Miskimens;
(2) Was he a child under eighteen;
(3) Did the defendants create a substantial risk to his health or safety;
(4) If so, did they do so by violating a duty of care, protection, or support; and

(5) Venue.

The second sentence of R.C. 2919.22(A) either supplies a further definition of what is a "violation of a duty of care" or it creates an affirmative defense exception capable of being raised by a defendant to defend against a charge that he has committed such a violation. The statute itself does not specifically label the second sentence as an affirmative defense.

The significance of the distinction lies, of course, in its effect upon the questions of burden of going forward with the evidence and burden of proof as outlined in R.C. 2901.05. The state asserts that the second sentence of R.C. 2919.22(A) is an affirmative defense, and that this then requires the *defendants* to prove the existence of the exception by a preponderance of the evidence if they are to use their treatment of the child's illness by prayer alone as an effective defense to the charge of endangering children which underlies the involuntary manslaughter charged in their indictment. Defendants respond that no such duty exists on their part and that the state must negate the existence of the exception as a part of *its* case.

Although neither the state nor the defense has produced any specific authority for this issue, the state's analysis of the relevant statutes and the underlying philosophy of affirmative defenses would seem persuasive. R.C. 2901.05(C) defines "affirmative defense" in the alternative. It is either:

(1) "A defense expressly designated as affirmative"; or
(2) "A defense involving an excuse or justification peculiarly within the knowledge of the accused, on which he can fairly be required to adduce supporting evidence."

While R.C. 2919.22(A) does not label its second sentence as an affirmative defense *per se,* as is done in neighboring R.C. 2919.21 (nonsupport of dependents) and R.C. 2919.23 (interference

with custody), it is nevertheless clear that the tenor of the second sentence is that of an "excuse or justification." Furthermore, if such excuse exists in this case, its existence would likely be a matter "peculiarly within the knowledge of the accused" and is certainly an issue upon which the accused "can fairly be required to adduce supporting evidence."

Despite defendants' analysis to the contrary, this court finds the second sentence of R.C. 2919.22(A) to be very much in the nature of the classic affirmative defense, i.e., "confession and avoidance." The exemption appears to say to parents, "You *may* legally create a substantial risk to the health of your child if you do so by treating the child 'by spiritual means through prayer alone, in accordance with the tenets of a recognized religious body' because such treatment is *not* a violation of the duty of care otherwise imposed."

Thus the second sentence permits such a parent to "confess" having created the health risk and to "avoid" what would otherwise be the criminal consequence of that act by proving, by a preponderance, a particular manner in which treatment was given, i.e., by spiritual means, etc.

Applied to the factual situation of the instant case, it strikes this court as most fair that the state should be required to prove, beyond a reasonable doubt: that the defendants were Seth's parents; that Seth was a child under eighteen; that defendants created a substantial risk to Seth's health or safety; that they did so by violating a parental duty of care, protection, or support; and that this happened in Coshocton County. Similarly it seems most fair that if Seth's parents are to be afforded the refuge from criminal responsibility for his death afforded by the so-called prayer exception, then they should be required to prove, by a preponderance, that they acted in conformity with requirements of the statutory provision creating the exception.

The parents alone, not the state, know whether or not they treated the child by "spiritual means." Furthermore, the questions of whether such treatment was done "in accordance with the tenets" of a recognized religious body or whether the parents and their religious affiliates constitute a "recognized religious body" are matters which it is clearly more fair to first require the accused to establish than to first require the state to negate.

A further criterion for deciding into which category an exception to generally prohibited conduct falls is whether the exception is part of the description of the offense itself or whether the exception merely exempts certain conduct from the general prohibition. On this basis the affirmative defense position again appears to be significantly more persuasive both in logic and in practical application. The second sentence is clearly in the nature of a proviso, and as stated in *Hale v. State* (1898), 58 Ohio St. 676, 686, quoting with approval from *State v. Miller* (1856), 24 Conn. 522:

" 'The rule everywhere laid down is, that after words of general prohibition whatever comes in by way of proviso or exception need not be negatived by the pleader, but properly comes from the accused.' "

Certainly if such exception need not be "pleaded" or charged by the state, then it need not be negatived by proof by the state.

As later stated in *Hale v. State, supra,* at 687-688:

"An indictment which charges a violation of the general prohibitory provision, makes a *prima facie* case; and if the accused, or the act with which he is charged, comes within any clause of the proviso, that is a matter which lies more especially within his knowledge, and should be brought forward by him in defence."

Further legal support for this

characterization of the exception is cited in the state's memorandum as a part of its analysis of the legislative history of this provision and of the parallel provisions in the Juvenile Code. (R.C. 2151.03 and 2151.421.) The circumstance of later insertion of the second sentence into R.C. 2919.22(A) is indicative of a desire on the part of the General Assembly to exempt certain conduct, rather than to merely add further definition to the original prohibition.

For these reasons, this court finds the second sentence of R.C. 2919.22(A) to be an affirmative defense and will so apply this provision to the facts of this case.

*Decision accordingly.*