COMMONWEALTH vs. DAVID R. TWITCHELL
(and a companion case[1] ).

Suffolk. May 4, 1993. - August 11, 1993.

Present: LIACOS, C.J., WILKINS, ABRAMS, NOLAN, LYNCH, O'CONNOR, & GREANEY, JJ.

*Homicide. Minor*, Medical treatment. *Wanton or Reckless Conduct. Religion. Common Law. Constitutional Law*, Freedom of religion. *Due Process of Law*, Vagueness of statute. *Attorney General.*

The parents of a seriously ill two and one-half year old child had a common law duty to seek medical treatment for their child, the violation of which, if their conduct was wanton or reckless, could support a conviction of involuntary manslaughter on the child's death [117-118], and the spiritual healing provisions of G. L. c. 273, § 1, a statute concerning child support and care, did not apply to foreclose the parents' prosecution for involuntary manslaughter [118-122].

In the case of parents who, as practicing Christian Scientists, did not seek medical treatment for their seriously ill two and one-half year old child, but, instead, relied on spiritual treatment and were subsequently convicted of involuntary manslaughter following the child's death, the circumstances, including the existence of an arguably misleading opinion of the Attorney General that was excerpted in certain Christian Science literature the parents consulted after their child became ill, would have justified a jury's finding that the parents reasonably believed that they could rely on spiritual treatment without incurring criminal liability and, where this affirmative defense was not asserted and presented to the jury, there was a substantial risk of a miscarriage of justice, requiring reversal of the parents' convictions. [123-130] NOLAN, J., dissenting.

INDICTMENTS found and returned in the Superior Court Department on April 22, 1988.

The cases were tried before *Sandra L. Hamlin*, J.

---

[1]Commonwealth *vs.* Ginger Twitchell.

The Supreme Judicial Court granted a request for direct appellate review.

*Steven M. Umin,* of the District of Columbia (*Kevin J. Hasson,* of the District of Columbia, *Rikki J. Klieman & Stephen J. Lyons* with him) for the defendants.

*Marcy Cass,* Assistant District Attorney (*Paul B. Linn,* Assistant District Attorney, with her) for the Commonwealth.

*Theodore E. Dinsmoor,* for The First Church of Christ, Scientist, amicus curiae, submitted a brief.

*Eric S. Maxwell & John Reinstein,* for Civil Liberties Union of Massachusetts, amicus curiae, submitted a brief.

WILKINS, J. David and Ginger Twitchell appeal from their convictions of involuntary manslaughter in connection with the April 8, 1986, death of their two and one-half year old son Robyn.[2] Robyn died of the consequences of peritonitis caused by the perforation of his bowel which had been obstructed as a result of an anomaly known as Meckel's diverticulum. There was evidence that the condition could be corrected by surgery with a high success rate.

The defendants are practicing Christian Scientists who grew up in Christian Science families. They believe in healing by spiritual treatment. During Robyn's five-day illness from Friday, April 4, through Tuesday, April 8, they retained a Christian Science practitioner, a Christian Science nurse, and at one time consulted with Nathan Talbot, who held a position in the church known as the "Committee on Publication."[3] As a result of that consultation, David Twitchell read a church publication concerning the legal rights and obligations of Christian Scientists in Massachusetts. That publication quoted a portion of G. L. c. 273, § 1, as then amended, which, at least in the context of the crimes de-

---

[2] The Twitchells and the Commonwealth sought direct appellate review which we granted.

[3] The "Committee on Publication" for each State is a one-person committee authorized by the church's founder, Mary Baker Eddy, to explain Christian Science to the community and to give advice to practitioners. Talbot was head of all the Committees on Publication in the country.

scribed in that section, accepted remedial treatment by spiritual means alone as satisfying any parental obligation not to neglect a child or to provide a child with physical care. We shall subsequently discuss this statute in connection with the defendants' claim, rejected by the trial judge, that the spiritual treatment provision in G. L. c. 273, § 1, protects them from criminal liability for manslaughter.[4]

We need not recite in detail the circumstances of Robyn's illness. The jury would have been warranted in concluding that Robyn was in considerable distress and that, in the absence of their belief in and reliance on spiritual treatment, the parents of a child in his condition would normally have sought medical treatment in sufficient time to save that child's life. There was also evidence that the intensity of Robyn's distress ebbed and flowed, perhaps causing his parents to believe that prayer would lead to the healing of the illness. On the other hand, the jury would have been warranted in finding that the Twitchells were wanton or reckless in failing to provide medical care for Robyn, if parents have a legal duty to provide a child with medical care in such circumstances and if the spiritual treatment provision of G. L. c. 273, § 1, did not protect them from manslaughter liability.

We shall conclude that parents have a duty to seek medical attention for a child in Robyn's circumstances, the violation of which, if their conduct was wanton or reckless, could support a conviction of involuntary manslaughter and that the spiritual healing provision in G. L. c. 273, § 1, did not bar a prosecution for manslaughter in these circumstances. We further conclude, however, that special circumstances in this case would justify a jury's finding that the Twitchells reasonably believed that they could rely on spiritual treat-

---

[4]The spiritual treatment provision then read, as it does now, as follows: "A child shall not be deemed to be neglected or lack proper physical care for the sole reason that he is being provided remedial treatment by spiritual means alone in accordance with the tenets and practice of a recognized church or religious denomination by a duly accredited practitioner thereof." G. L. c. 273, § 1 (1992 ed.).

ment without fear of criminal prosecution. This affirmative defense should have been asserted and presented to the jury. Because it was not, there is a substantial risk of a miscarriage of justice in this case, and, therefore, the judgments must be reversed.

1. We shall first consider whether the law generally imposes a parental duty to provide medical services to a child, the breach of which can be the basis of a conviction for involuntary manslaughter. We thus put aside temporarily the question of what, if any, application the spiritual treatment provision in G. L. c. 273, § 1, has to this case.

The Commonwealth presented its case on the theory that each defendant was guilty of involuntary manslaughter because the intentional failure of each to seek medical attention for their son involved such "a high degree of likelihood that substantial harm will result to" him as to be wanton or reckless conduct. *Commonwealth* v. *Welansky*, 316 Mass. 383, 399 (1944). See *Commonwealth* v. *Godin*, 374 Mass. 120, 129 (1977), cert. denied, 436 U.S. 917 (1978). Our definition of involuntary manslaughter derives from the common law. See *Commonwealth* v. *Catalina*, 407 Mass. 779, 783 (1990). A charge of involuntary manslaughter based on an omission to act can be proved only if the defendant had a duty to act and did not do so. *Commonwealth* v. *Welansky*, *supra*. That duty, however, is not limited to those duties whose violation would create civil liability. *Commonwealth* v. *Godin*, *supra* at 126-127.

The Commonwealth claims that the defendants owed an affirmative duty of care to their son which they wantonly or recklessly failed to perform. The duty to provide sufficient support for a child is legally enforceable in a civil proceeding against a parent. See *Ventura* v. *Ventura*, 407 Mass. 724, 729 (1990). A breach of that duty is a misdemeanor. G. L. c. 273, § 1 (1992 ed.). Where necessary to protect a child's well-being, the Commonwealth may intervene, over the parents' objections, to assure that needed services are provided. See *Matter of McCauley*, 409 Mass. 134, 137 (1991); *Custody of a Minor*, 375 Mass. 733, 748-749 (1978). More im-

portant, for our current purposes, a parental duty of care has been recognized in the common law of homicide in this Commonwealth. See *Commonwealth* v. *Hall*, 322 Mass. 523, 528 (1948) (conviction of murder in the second degree based on withholding of food and liquids).

The defendants argue, however, that any common law duty of care does not include a duty to provide medical treatment and that there is no statute imposing such a duty except G. L. c. 273, § 1, which, in turn, in their view, provides them with complete protection against any criminal charge based on their failure to seek medical treatment for their son. In their argument that the common law of the Commonwealth does not include a duty to provide medical treatment, the defendants overlook *Commonwealth* v. *Gallison*, 383 Mass. 659 (1981). In that case, we upheld a conviction of manslaughter, saying that a parent who "made no effort to obtain medical help, knowing that her child was gravely ill," could be found guilty of wanton or reckless involuntary manslaughter for her child's death caused by her omission to meet her "duty to provide for the care and welfare of her child." *Id.* at 665. Cf. *Commonwealth* v. *Michaud*, 389 Mass. 491, 498-499 (1983) (evidence insufficient to support Commonwealth's theory of involuntary manslaughter for reckless failure to seek medical attention for a child). The *Gallison* opinion did not rely on § 1 as the basis of the parent's duty to provide medical care. It relied rather on the more general duty of care underlying civil and criminal liability. *Commonwealth* v. *Gallison*, *supra* at 665. There is, consequently, quite apart from § 1, a common law duty to provide medical services for a child, the breach of which can be the basis, in the appropriate circumstances, for the conviction of a parent for involuntary manslaughter.

2. We, therefore, consider the impact, if any, of G. L. c. 273, § 1, on this case. The defendants argue that the spiritual treatment provision in § 1 bars any involuntary manslaughter charge against a parent who relies, as they did, on spiritual treatment and who does not seek medical attention for his or her child, even if the parent's failure to seek such

care would otherwise be wanton or reckless conduct. We disagree.

The Commonwealth asks us to eliminate any application of the spiritual treatment provision to this case by holding that the spiritual treatment provision is unconstitutional. The argument is based solely on the establishment of religion clause of the First Amendment to the Constitution of the United States and the equal protection clause of the Fourteenth Amendment to the Constitution of the United States. Apparently, the latter theory was not raised below, and the former was raised but was not decided. These claims of unconstitutionality place the Commonwealth in the position of challenging the constitutionality of its own duly enacted statute. Issues of timeliness and standing are obvious. The retroactive invalidation of a statute on which a criminal defendant relied in justification of his conduct would present a serious fairness issue. Cf. *Marks* v. *United States*, 430 U.S. 188, 196 (1977). Because we shall conclude that the spiritual treatment provision does not apply to foreclose a charge of involuntary manslaughter, we need resolve neither these preliminary questions nor the underlying constitutional one. The constitutional issues, of course, remain within § 1. On those issues, see *Dalli* v. *Board of Educ.*, 358 Mass. 753, 759 (1971); *Walker* v. *Superior Court*, 47 Cal. 3d 112, 144 (1988) (Mosk, J., concurring), cert. denied, 491 U.S. 905 (1989); *State* v. *McKown*, 475 N.W.2d 63, 69 n.9 (Minn. 1991), cert. denied, 502 U.S. 1036 (1992); *State* v. *Miskimens*, 22 Ohio Misc. 2d 43 (1984).[5]

---

[5]In *Walker* v. *Superior Court*, 47 Cal. 3d 112 (1988), cert. denied, 491 U.S. 905 (1989), the Attorney General argued that a provision similar to the spiritual treatment provision in § 1 should not be imported into a California manslaughter statute because the spiritual treatment provision "offends the establishment clauses of the state and federal Constitutions." *Id.* at 144 (Mosk, J., concurring). The opinion of the court did not reach this issue. Justice Mosk's concurrence goes beyond saying that the statute should be construed to avoid a constitutional problem to conclude outright that the California spiritual provision was unconstitutional. *Id.* at 145. His concurring opinion seems to have assumed that the Attorney General had standing to raise that constitutional issue.

Section 1 of G. L. c. 273 provides no complete protection to a parent against a charge of involuntary manslaughter that is based on the parent's wanton or reckless failure to provide medical services to a child.[6] Section 1 concerns child support and care in a chapter of the General Laws that deals not so much with the punishment of criminal conduct as with motivating parents to fulfil their natural obligations of support. See *Kelley, petitioner*, 292 Mass. 198, 200 (1935); *Commonwealth* v. *Herrick*, 263 Mass. 25, 26 (1928); *Commonwealth* v. *Acker*, 197 Mass. 91, 92-93 (1908). On the other hand, the principle underlying involuntary manslaughter is the Commonwealth's "interest that persons within its territory should not be killed by the wanton and reckless conduct of others." *Commonwealth* v. *Godin*, 374 Mass. 120, 126 (1977). See *Commonwealth* v. *Atencio*, 345 Mass. 627, 629 (1963). It is unlikely that the Legislature placed the spiritual treatment provision in § 1 to provide a defense to,

---

[6] At the time of Robyn Twitchell's death, the relevant parts of G. L. c. 273, § 1, read as follows:

"Any spouse or parent who without just cause deserts his spouse or minor child, whether by going into another town in the commonwealth or into another state, and leaves them or any or either of them without making reasonable provision for their support, and any spouse or parent who unreasonably neglects or refuses to provide for the support and maintenance of his spouse, whether living with him or living apart from him for justifiable cause, or of his minor child, and any spouse or parent who abandons or leaves his spouse or minor child in danger of becoming a burden upon the public, and any parent of a minor child or any guardian with care and custody of a minor child, or any custodian of a minor child, who willfully fails to provide necessary and proper physical, educational or moral care and guidance, or who permits said child to grow up under conditions or circumstances damaging to the child's sound character development, or who fails to provide proper attention for said child, shall be punished by a fine of not more than five hundred dollars or by imprisonment for not more than two years, or both. A child shall not be deemed to be neglected or lack proper physical care for the sole reason that he is being provided remedial treatment by spiritual means alone in accordance with the tenets and practice of a recognized church or religious denomination by a duly accredited practitioner thereof."

G. L. c. 273, § 1, as appearing in St. 1977, c. 848, § 2.

or to alter any definition of, common law homicide.[7] There is no history to § 1 that suggests that the spiritual treatment provision carries any message beyond § 1 itself.[8] The act that added the spiritual treatment provision was entitled "An Act defining the term 'proper physical care' under the law relative to care of children by a parent." St. 1971, c. 762. The amendment's concern seems focused on the subject matter of § 1 and certainly not directed toward changing the common law of homicide. Indeed, that was the view expressed at the time by a representative of the Christian Science Church.[9]

---

[7]General Laws c. 265, § 13 (1992 ed.), which fixes the penalty for common law manslaughter, would be the logical place for any such recognition of spiritual treatment as barring a charge of involuntary manslaughter.

[8]A predecessor of § 1, enacted in 1882, provided that "[w]hoever unreasonably neglects to provide for the support of his minor child shall be punished by fine . . . or by imprisonment." St. 1882, c. 270, § 4. After several minor amendments, the statute was rewritten in 1909 to impose, among other things, a duty of physical care of children on parents: "[A]ny parent . . . whose minor child, by reason of the neglect, cruelty, drunkenness, habits of crime, or other vice of such parent, is growing up . . . without proper physical care ... . shall be punished." St. 1909, c. 180. This formulation survived major revisions in 1911 and 1931. See St. 1911, c. 456, § 1; St. 1931, c. 226. In 1954, G. L. c. 273, § 1, was amended to state that "any parent of a minor child . . . who wilfully fails to provide necessary and proper physical, educational or moral care and guidance . . . shall be punished." St. 1954, c. 539. The spiritual treatment provision was added in 1971. St. 1971, c. 762. With minor revisions making § 1 gender-neutral (St. 1977, c. 848, § 2), this is how § 1 stood at the time of Robyn Twitchell's death. See note 6 above.

Section 1 was rewritten by St. 1986, c. 310, § 22. The amendment removed from § 1 any reference to wilful failure to provide necessary and proper physical care and limited any violation of § 1 to matters of failure to support. Nevertheless, the spiritual treatment language with which we are here concerned was retained verbatim, even though that portion of it that concerns the lack of proper physical care no longer seems applicable to any crime defined in § 1. See St. 1986, c. 310, § 22. It is arguable that, because of the 1986 amendment, the spiritual treatment provision of § 1 has an application outside of § 1 that it did not have before. The Legislature may wish to consider ways by which the new uncertainty can be resolved.

[9]A statement was made to a legislative committee in February, 1971, by Dr. J. Buroughs Stokes, the then "Committee on Publication for The First Church of Christ, Scientist." That statement is available in the archives

The spiritual treatment provision refers to neglect and lack of proper physical care, which are concepts set forth earlier in § 1, as then amended, as bases for punishment: (1) neglect to provide support and (2) wilful failure to provide necessary and proper physical care. These concepts do not underlie involuntary manslaughter. Wanton or reckless conduct is not a form of negligence. See *Commonwealth v. Godin, supra* at 127. Wanton or reckless conduct does not involve a wilful intention to cause the resulting harm. See *Commonwealth* v. *Welansky*, 316 Mass. 383, 397-398 (1944). An involuntary manslaughter verdict does not require proof of wilfulness. See *Commonwealth* v. *Catalina*, 407 Mass. 779, 789 (1990); *Commonwealth* v. *Welansky, supra* at 397-398, 399. Thus, by its terms, the spiritual treatment provision in § 1 does not apply to involuntary manslaughter.[10]

concerning St. 1971, c. 762. It indicates that the Christian Science Church had proposed an amendment to G. L. c. 273, § 1, "to make it clear that Christian Scientists, in providing their children with Christian Science treatment and care, are not violating *this* law" (emphasis supplied). *Id.* at 2. "We are seeking legal protection from the possibility of being considered neglectful by any individual in authority who may misunderstand our methods . . . ." *Id.* at 3.

[10]We have not relied on the opinions of other courts that have dealt with a spiritual treatment statute in relation to another statute. Those cases involved arguments about alleged conflicting statutes, whereas this case concerns a claim that the Legislature has modified the common law of involuntary manslaughter. The background to the spiritual healing legislation in those States is different from ours. In *State* v. *McKown*, 475 N.W.2d 63 (Minn. 1991), cert. denied, 502 U.S. 1036 (1992), the court held that a spiritual treatment provision in a child neglect statute did not apply to the second degree manslaughter statute. *Id.* at 67. The Supreme Court of California reached the same general conclusion in *Walker* v. *Superior Court*, 47 Cal. 3d 112, 134 (1988) ("[P]rayer treatment will be accommodated as an acceptable means of attending to the needs of a child only insofar as serious physical harm or illness is not at risk. When a child's life is placed in danger, we discern no intent to shield parents from the chastening prospect of felony liability"). The same reasoning is reflected in *People in the Interest of D.L.E.*, 645 P.2d 271 (Colo. 1982), a case not involving a criminal charge relating to the death of a child. The same conclusion was reached in *Hall* v. *State*, 493 N.E.2d 433, 435 (Ind. 1986) ("Prayer is not permitted as a defense when a caretaker engages in omissive conduct which results in the child's death").

All these opinions reached the result that we have reached, that is, a spiritual treatment statute does not apply to exonerate a parent from some

3. The defendants argue that the failure to extend the protection of the spiritual treatment provision to them in this case would be a denial of due process of law because they lacked "fair warning" that their use of spiritual treatment could form the basis for a prosecution for manslaughter.[11] Fair warning is part of the due process doctrine of vagueness, which "requires that a penal statute define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement." *Kolender* v. *Lawson*, 461 U.S. 352, 357 (1983). See *Smith* v. *Goguen*, 415 U.S. 566, 572 (1974); *Commonwealth* v. *Jasmin*, 396 Mass. 653, 655 (1986); *Commonwealth* v. *Sefranka*, 382 Mass. 108, 110 (1980). Many fair warning challenges involve statutes that are unconstitutionally vague on their face, such as vagrancy statutes. See, e.g., *Papachristou* v. *Jacksonville*, 405 U.S. 156 (1972); *Alegata* v. *Commonwealth*, 353 Mass. 287 (1967). Even if a statute is clear on its face, there may not be fair warning in the circumstances of particular defendants. The defendants here argue that they have been denied fair warning in three different ways. They contend that fair warning (1) would be denied by an unforeseeable retroactive judicial interpretation that the spiritual treatment provision does not protect them (*Bouie* v. *Columbia*, 378 U.S. 347, 354-355 [1964]), (2) is denied by the existence of contradictory commands in the law of the Commonwealth (*United States* v. *Cardiff*, 344 U.S. 174 [1952]), and (3) is denied because they were officially misled by an opinion of the Attorney General of the Commonwealth

---

other criminal charge, such as unlawful homicide. Differences exist, however, on the question whether a court's construction of the spiritual treatment statute may fairly be applied to the particular defendant, an issue to which we now turn.

[11]The defendants' argument is based on the Fourteenth Amendment to the Constitution of the United States and not on a claim of more favorable rights under the Constitution of the Commonwealth. See *Commonwealth* v. *Jasmin*, 396 Mass. 653, 655 (1986).

(*Raley* v. *Ohio*, 360 U.S. 423, 438-439 [1959]; *United States* v. *Pennsylvania Indus. Chem. Corp.*, 411 U.S. 655, 674-675 [1973]). We find some merit only in the last of these contentions.

The defendants claim that a statute (G. L. c. 273, § 1) that clearly provided protection against criminal prosecution for a statutory crime did not give fair warning that it did not provide similar protection against prosecution for a more serious common law crime. For the reasons we have given, a charge of common law involuntary manslaughter is not barred by the spiritual treatment provision of § 1. That conclusion is not a surprise judicial interpretation of the kind that due process of law directs may not be applied retroactively, as was the situation in *Bouie* v. *Columbia*, *supra* at 362-363, and in *Commonwealth* v. *Wilkinson*, 415 Mass. 402, 407-408 (1993).[12]

There is no mixed signal from the coexistence of the spiritual treatment provision and the common law definition of involuntary manslaughter. Cf. *United States* v. *Cardiff*, 344 U.S. 174, 176 (1952). The spiritual treatment provision protects against criminal charges of neglect and of wilful failure to provide proper medical care and says nothing about protection against criminal charges based on wanton or reckless

---

[12]In *Commonwealth* v. *Wilkinson*, 415 Mass. 402, 407-408 (1993), we held that, where a statute did not give fair warning that it had abrogated common law rights, our judicial conclusion that the statute did abrogate those rights should not be given retroactive application, quoting *Bouie* v. *Columbia*, 378 U.S. 347, 354 (1964).

Our opinion in this case does not involve a change in a common law rule. We have applied the doctrine of the *Bouie* case when we have changed or eliminated a long-standing common law rule. See, e.g., *Commonwealth* v. *Cass*, 392 Mass. 799, 807-808 (1984) (new rule that fetus is person under definition of vehicular homicide not applied retroactively); *Commonwealth* v. *Lewis*, 381 Mass. 411, 418 (1980) (abolishing year-and-a-day rule in homicides prospectively), cert. denied sub nom. *Phillips* v. *Massachusetts*, 450 U.S. 929 (1981). Cf. *Commonwealth* v. *Walter R.*, 414 Mass. 714, 718-719 (1993) (applying prospectively from date of earlier decision new rule on age presumption for rape defendants, without reference to *Bouie*); *Commonwealth* v. *Klein*, 372 Mass. 823, 832-834 (1977) (applying new rule for use of deadly force in citizen arrest prospectively for reasons of fairness without reaching due process considerations).

conduct. The fact that at some point in a given case a parent's conduct may lose the protection of the spiritual treatment provision and may become subject to the application of the common law of homicide is not a circumstance that presents a due process of law "fair warning" violation. See *Walker* v. *Superior Court*, 47 Cal. 3d 112, 142-143 (1988).[13]

The defendants argue that they were misled by an opinion of the Attorney General that caused them to conclude that they were protected by the spiritual treatment provision. The claim is that their manslaughter convictions violated their due process right to fair warning because they were entrapped for "exercising a privilege which the State clearly had told [them] was available." *Raley* v. *Ohio, supra* at 438. See *United States* v. *Pennsylvania Indus. Chem. Corp., supra* at 673-674. There is, however, no evidence to support the contention that they relied directly on that opinion or that they knew of the Attorney General's opinion. Indeed it does not appear that the defendants made any argument to the trial judge that they relied on an official interpretation of the law.[14]

---

[13]Other jurisdictions have divided on the question whether to accept a due process of law argument that a statutory pattern did not give adequate notice that a spiritual treatment provision did not provide an all-encompassing protection against criminal prosecutions. In Florida, apparently only on Federal due process grounds, the court dismissed the charges, concluding "that the legislature has failed to clearly indicate the point at which a parent's reliance on his or her religious beliefs in the treatment of his or her children becomes criminal conduct." *Hermanson* v. *State*, 604 So. 2d 775, 782 (Fla. 1992). The Minnesota Supreme Court reached the same conclusion, for the same reason, in *State* v. *McKown*, 475 N.W.2d 63, 68 (Minn. 1991). A more reasoned analysis appears in *Walker* v. *Superior Court*, 47 Cal. 3d 112, 142 (1988). To the claim that the California statutes provided no notice of the point at which lawful prayer treatment becomes unlawful, the court responded, first quoting Justice Holmes in *Nash* v. *United States*, 229 U.S. 373, 377 (1913), that " 'the law is full of instances where a man's fate depends on his estimating rightly, that is, as the jury subsequently estimates it, some matter of degree' " and added that "[t]he 'matter of degree' that persons relying on prayer treatment must estimate rightly is the point at which their course of conduct becomes criminally negligent. In terms of notice, due process requires no more."

[14]Defense counsel did not request a jury instruction on this theory of reliance. The Commonwealth makes no objection to the defendant's argu-

In May, 1975, the Attorney General gave an opinion on a number of topics to the deputy director of the Office for Children. Rep. A.G., Pub. Doc. No. 12, at 139 (1975). The relevant portion of that opinion, which is quoted in the margin,[15] answers a general question "whether parents who fail to provide medical services to children on the basis of religious beliefs will be subject to prosecution for such failure." *Id.* at 140. A reasonable person not trained in the law might fairly read the Attorney General's comments as being a negative answer to the general question whether in any circumstances such parents may be prosecuted. It is true that the answer comes to focus on negligent failures of parents, and we know that wanton or reckless failures are different. But an answer that says that children may receive needed serv-

ment on this ground, however, and the judge's views on the spiritual treatment provision suggest that, if requested, no such instruction would have been given. We shall consider whether application of the reasonable reliance doctrine might have made a difference in this case and shall conclude that the omission of this affirmative defense created a substantial risk of a miscarriage of justice.

[15]"Secondly, you have sought my opinion as to whether parents who fail to provide medical services to children on the basis of religious beliefs will be subject to prosecution for such failure. Also, you have restated a concern of the Department of Health, Education and Welfare as to whether services will be available to children who are unable to obtain medical assistance because of their parents' religious beliefs.

"The Massachusetts child abuse reporting law does not specifically address itself to the relationship between the religious beliefs of the parent and failure to provide medical care. However, G. L. c. 273, § 1 does address itself to that precise issue. General Laws, c. 273, § 1 provides, *inter alia*, as follows:

'A child shall not be deemed to be neglected or lack proper physical care for the sole reason that he is being provided remedial treatment by spiritual means alone in accordance with the tenets and practice of a recognized church or religious denomination by a duly accredited practitioner thereof.'

"General Laws, c. 273, § 1 is a criminal statute and it expressly precludes imposition of criminal liability as a negligent parent for failure to provide medical care because of religious beliefs. However, the intent of Chapter 119 is, clearly, to require that children of such parents be provided services whenever the need arises. Clearly under Chapter 119 children may receive services notwithstanding the inability to prosecute parents in such cases."

ices "notwithstanding the inability to prosecute parents in such cases" (*id.*), and issues no caveat concerning homicide charges, invites a conclusion that parents who fail to provide medical services to children on the basis of religious beliefs are not subject to criminal prosecution in any circumstances.

Although the Twitchells were not aware of the Attorney General's opinion, they knew of a Christian Science publication called "Legal Rights and Obligations of Christian Scientists in Massachusetts." The defense offered the publication in evidence. The judge held a voir dire on the question whether to admit that portion of the publication which concerned the furnishing of proper physical care to a child and which David Twitchell had read on the Sunday or Monday before Robyn's death. The judge excluded the evidence, and, although the defendants objected at trial, they have not argued to us that the exclusion was error. The relevant portion of the publication, after quoting G. L. c. 273, § 1, added, repeating, precisely but without citation, a portion of the Attorney General's opinion, that this criminal statute "expressly precludes imposition of criminal liability as a negligent parent for failure to provide medical care because of religious beliefs. But this does not prohibit the court from ordering medical treatment for children." There is no mention of potential criminal liability for involuntary manslaughter.

Although we have held that the law of the Commonwealth was not so unclear as to bar the prosecution of the defendants on due process of law principles, the Attorney General's opinion presents an additional element to the fairness assessment. It is obvious that the Christian Science Church's publication on the legal rights and obligations of Christian Scientists in Massachusetts relied on the Attorney General's 1975 opinion. That opinion was arguably misleading because of what it did not say concerning criminal liability for manslaughter. If the Attorney General had issued a caveat concerning manslaughter liability, the publication (which, based on such portions of it as appear in the record, is balanced and fair) would have referred to it in all reasonable likeli-

hood. Nathan Talbot, who served as the Committee on Publication for the church and with whom the Twitchells spoke on the Sunday or Monday before Robyn's death, might well have given the Twitchells different advice.

Although it has long been held that "ignorance of the law is no defence" (*Commonwealth* v. *Everson*, 140 Mass. 292, 295 [1885]), there is substantial justification for treating as a defense the belief that conduct is not a violation of law when a defendant has reasonably relied on an official statement of the law, later determined to be wrong, contained in an official interpretation of the public official who is charged by law with the responsibility for the interpretation or enforcement of the law defining the offense. See Model Penal Code § 2.04 (3) (b) (Proposed Official Draft 1962). Cf. *United States* v. *Pennsylvania Indus. Chem. Corp.*, *supra* at 673-674.[16] Federal courts have characterized an affirmative defense of this nature as "entrapment by estoppel." See *United States* v. *Levin*, 973 F.2d 463, 468 (6th Cir. 1992); *United States* v. *Smith*, 940 F.2d 710, 714-715 (1st Cir. 1991); *United States* v. *Austin*, 915 F.2d 363, 365-366 (8th Cir. 1990), cert. denied, 499 U.S. 977 (1991); *United States* v. *Tallmadge*, 829 F.2d 767, 773-774 (9th Cir. 1987). "Entrapment by estoppel has been held to apply when an official assures a defendant that certain conduct is legal, and the defendant reasonably relies on that advice and continues or initiates the conduct." *United States* v. *Smith*, *supra* at 714. The defense rests on principles of fairness grounded in Federal criminal cases in the due process clause of the Fifth Amendment to the United States Constitution. See *United States* v. *Levin*, *supra* at 468; *United States* v. *Smith*, *supra* at 714; *United States* v. *Austin*, *supra* at 366. The defense generally involves factual determinations (see *United States* v. *Levin*, *supra* at 468) based on the totality of the circumstances attending the prosecution (see *United States* v. *Smith*, *supra* at 714), although

---

[16]There is special merit to such a rule if religious beliefs are involved and if the defendant was attempting to comply with the law while adhering, as far as possible, to his religious beliefs and practices.

the authority of the government official making the announcement is obviously a question of law.

The Twitchells were entitled to present such an affirmative defense to the jury. The Attorney General was acting in an area of his official responsibilities. He is the chief law officer of the Commonwealth, with the power to set a unified and consistent legal policy for the Commonwealth. See G. L. c. 12, § 3 (1992 ed.); *Feeney* v. *Commonwealth,* 373 Mass. 359, 363-364 (1977); *Secretary of Admin. & Fin.* v. *Attorney Gen.,* 367 Mass. 154, 159-163 (1975). See also G. L. c. 12, § 27 (1992 ed.). He is statutorily empowered to "give his opinion upon questions of law submitted to him" by the executive branch or the Legislature. G. L. c. 12, § 9 (1992 ed.). Whether a person would reasonably conclude that the Attorney General had ruled that § 1 provided protection against a manslaughter charge is a question of fact. Whether the defendants in turn reasonably relied on the church's publication and on the advice of the Committee on Publication, assuming that the construction of the Attorney General's opinion was reasonable, also presents questions of fact. See *United States* v. *Levin, supra* at 465 (notice of Federal agency approval of contemplated actions sufficient when received indirectly). In the resolution of these factual questions, the relevant portion of the Attorney General's opinion and the relevant portion of the church's publication will be admissible. The jury should also be advised of the terms of the spiritual treatment provision of § 1.

The Twitchells were entitled to present such an affirmative defense to the jury. We can hardly fault the judge for not doing so because the defense did not make such an argument or request a jury instruction on that defense. The issue was one that, if presented to them, could well have changed the jury's verdicts. Evidence showed that the defendants were deeply motivated toward helping their child, while at the same time seeking to practice their religion within the limits of what they were advised that the law permitted. The issue of their reliance on advice that had origins in the Attorney General's opinion should have been before the jury. There-

fore, the failure to present the affirmative defense to the jury, along with the relevant portion of the church's publication which the judge excluded, created a substantial risk of a miscarriage of justice requiring that we reverse the convictions, even in the absence of a request for jury instruction on the subject. See *Commonwealth* v. *Bohannon,* 376 Mass. 90, 94 n.4 (1978). For these reasons, the judgments must be reversed, the verdicts must be set aside, and the cases remanded for a new trial, if the district attorney concludes that such a prosecution is necessary in the interests of justice.[17]

*So ordered.*

NOLAN, J. (dissenting). The court today sets forth certain unimpeachable propositions. Among the more relevant such propositions is that the spiritual treatment provisions of

---

[17]Because the burden is on the defendants to prove by a preponderance of the evidence the facts that support the affirmative defense, it is not our role to rule that the defendants met that burden. The sincerity of their religious beliefs and their attempt to determine what their legal obligations were seem to be unquestionable. Their reliance on the church's publication and that publication's reliance in turn on the Attorney General's opinion also seem not to be in dispute. The reasonableness of these acts of reliance may be debatable.

The trial lasted for fifty-four days, including an extended jury selection process. The defendants were placed on probation for ten years on July 6, 1990, subject to the requirements that there be periodic medical checkups by a pediatrician of all their children, that the parents seek medical attention for any signs of a child's serious illness, and maximum supervision by the probation department, subject to review as to the level of supervision after one year. Three years have now passed since the sentencing. The basic principle has been established that § 1 did not provide the Twitchells with protection against a charge of involuntary manslaughter. But see note 8 above.

If there is a new trial, the judge should exercise great care that the religious beliefs of the Twitchells and other Christian Scientists are not implicitly or explicitly placed on trial. If the prosecution seeks to cross-examine a witness about church doctrine or his or her religious beliefs, on objection the judge should consider carefully the relevance of the evidence sought in relation to any prejudice that may result.

G. L. c. 273, § 1 (1992 ed.), are no defense to common law manslaughter, the subject of the indictments in these cases.

The Attorney General's opinion refers to the spiritual treatment provisions of the statute and deals exclusively with negligence ("failure" to provide). The Attorney General's opinion does not reach homicide charges against parents and for this reason, the court is improperly straining in concluding that the opinion might be read in a manner that "invites a conclusion that parents who fail to provide medical services to children on the basis of religious beliefs are not subject to criminal prosecution in any circumstances." *Ante* at 127.

To focus on the precise issue, the error that the court assigns as the basis for reversal is the exclusion from evidence of a Christian Science publication that quoted the opinion of the Attorney General in part without ever identifying the source of language as being part of the Attorney General's opinion. The defendants were not even aware of the opinion of the Attorney General and they relied entirely on the church's publication. However, even this publication does not exclude criminal liability for common law manslaughter. The defendants offered the publication in evidence and objected to its exclusion but, curiously, they did not argue that the exclusion was error. The reason for their failure so to argue, I believe, was their realization that it was *not* error to exclude it and in this regard, they were correct. The publication was properly excluded because it was not competent evidence on the issue of manslaughter. For this reason, the defendants' reliance on it is not relevant and it should not be considered by a jury. Accordingly, I dissent.